

Todd S. Capielano, LRC, CRC, LPC, CLCP, CCM
tcapielano@stokes-associates.com
504.454.5009
Direct Dial: 504.608.6957
Cell: 504.388.6910

January 23, 2019

Mr. Geoffrey Ormsby
Smith & Fawer, LLC
201 St. Charles Ave.
New Orleans, LA 70170-3702

***VIA EMAIL: gormsby@smithfawer.com***

|  | RE: | Shane Macy |
|---|-----|------------|
|  | My File Number: | TC18596 |

On 12/20/18, I met with Mr. Shane Macy for the purpose of conducting a vocational and life care plan assessment. The following report is based on a clinical interview with Mr. Macy, a review of available records provided by your office, consultation with Dr. Oberlander, as well as the results of vocational testing and research. The report is organized in the following sections: **Introduction, Clinical Interview, Analysis of Records Reviewed, Vocational Testing, Vocational Analysis,** and **Life Care Plan.** Prior to the interview, Mr. Macy was asked to review a Privacy Notice regarding disclosure of medical information and a Professional Disclosure and Declaration of Practices and Procedures. He was informed that he was being seen for an assessment only, that there was no client/counselor relationship, and that a report would be generated. The following records were received and reviewed:

***RECORDS RECEIVED AND REVIEWED:***

1. Medical records from Michael O'Brien, MD;

2. Medical records from Christopher Maulucci, MD;

3. Medical records from Felix Savoie, MD;

4. Medical records from Aaron Dumont, MD;

5. Records from United States Department of Labor Report of Earnings;

6. Medical records from the Neuromedical Center, Eric Oberlander, MD;

7. Functional Capacity Evaluation report from ISR Physical Therapy, dated 09/25/17;

8. Records from Seyler Favaloro, dated 05/18/17 to 08/20/18;

9. Income tax returns of Mr. Macy from 2013 to 2015;

10. Physical therapy records from Tulane Institute of Sports Medicine.



EXHIBIT
A

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page 2 of 21

# INTRODUCTION

**Reason for Referral:**

Mr. Macy is a 35-year old man (date of birth 09/10/83), who reported being involved in a work-related incident on 12/16/15 resulting in injuries to his shoulders and neck. Since that time, he has participated in medical treatment and rehabilitation. I was asked to conduct a vocational and life care plan assessment to determine factors that relate to Mr. Macy's post-injury earning capacity, as well as the costs associated with future medical needs related to his injury sustained on 12/16/15.

**Pertinent History:**

Mr. Macy resides in New Orleans, Louisiana. He holds a valid, regular Louisiana driver's license and is capable of operating automatic transmission vehicles. Mr. Macy is approximately 5'10" tall, weighs approximately 175 lbs., and is right-hand dominant.  Mr. Macy reported that he drinks alcohol daily to alleviate his pain.

# CLINICAL INTERVIEW

**History of Presenting Problems (per Mr. Macy):**

Mr. Macy reported that he felt pain in his neck into his right arm on 12/16/15 on the job while employed with Cooper T. Smith. He continued to work that day and subsequently sought treatment at urgent care due to increased pain. Mr. Macy began treating with Dr. Katz, who diagnosed herniated discs at C5-C7 and recommended a cervical fusion. Mr. Macy also sought treatment from Dr. Savoie for his right shoulder and underwent dry needling and physical therapy. According to Mr. Macy, Dr. Dumont agreed that he required neck surgery, and Dr. Maulucci performed a disc replacement on 05/18/16. Following surgery, Mr. Macy reportedly continued with weakness in his right arm and was evaluated by Dr. Macalister in Houma, LA. Mr. Macy reported that he was recently evaluated by Dr. Oberlander who recommended a cervical x-ray and MRI. Mr. Macy indicated that his next appointment with Dr. Oberlander is scheduled for 02/19/19.

**Medical Conditions Predating 12/16/15:**

| Type | Note |
|---|---|
| Boating Incident | 2011- right shoulder grade I separation; participated in physical therapy; continued working (Dr. O'Brien) |

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **3** of **21**

**Mr. Macy's report of pain:**
**(0 = NO PAIN; 10 = WORST PAIN IMAGINABLE)**

**Body Part**: Left Shoulder
Description: constant, sharp pain
Highest in prior two weeks: /10
Pain at time of interview: 3-4/10

**Body Part**: Right Shoulder
Description: cramping, pulling pain
Lowest in prior two weeks: 2/10
Average in prior two weeks: /10

Mr. Macy reported experiencing headaches and pain in the neck area approximately 1/month, lasting about 1 week in duration, with an intensity of 6/10.

Mr. Macy reported limitations with sitting, bending, lifting up to 40 lbs., climbing ladders, stooping, crawling, reaching overhead, decreased handling/grip strength, fine finger manipulation, and numbness/tingling in his right fingers. He also reported decreased energy/stamina. Mr. Macy reported difficulties with performing dressing, outdoor work, and handy man duties. He noted that he requires the ability to alternate positions and limit activity.


**Education and Training**

Mr. Macy reported that he graduated from Harvard High School (Chicago) in 2002. He attended McHenry County Community College for one semester taking general classes. Mr. Macy reportedly graduated from Full Sail University in 2006 with an Associate of Science degree in Film.

Mr. Macy also has a TWIC card, and has participated in first aid and firefighting training classes.

Mr. Macy reported having computer knowledge, and he can access his email, and navigate the internet. He owns a computer and can use a keyboard and mouse.

**Work History:**

Mr. Macy reported the following work history while in school:

**Employer:** veterinary clinic
**Job Title:** Kennel Cleaner
**Duties:** Cleaned kennels
**PT/FT:** PT

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **4** of **21**

**Employer:** Subway
**Job Title:** Sandwich Maker
**PT/FT:** PT

Mr. Macy reported the following work history prior to the time of injury:

**Employer:** Dreiski Moving Company
**Job Title:** Mover/Driver
**Duties:** Moved items from houses
**Dates:** 2 years
**PT/FT:** FT
**Salary:** $12.00/hour

**Employer:** Applebee's
**Job Title:** Server
**Duties:** Served food and drinks to customers
**Dates:** 1.5 years
**Reason for Leaving:** Moved to Austin
**PT/FT:** FT

He also worked on a shrimp boat while living in Gulfport, MS

**Job:** Volunteered for various medical studies/experiments
**Dates:** 1.5 years
**Reason for Leaving:** Moved to Orlando
**PT/FT:** PT

**Employer:** Delaney's Tavern
**Job Title:** Barback
**Duties:** Assisted bartender
**Dates:** 1 year
**PT/FT:** PT

**Job:** Freelance on film sets
**Job Title:** Gaffer
**Duties:** Worked under the Director of Photography to arrange set lights
**Dates:** 1 year
**Reason for Leaving:** Moved to L.A.
**PT/FT:** PT

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **5** of **21**

**Employer:** Bunim Murray
**Job Title:** Casting Coordinator
**Duties:** Managed profiles of cast members, advertised, received inquiries, and took notes during interviews
**Dates:** 2 years
**Reason for Leaving:** did not like the film industry
**PT/FT:** FT
**Salary:** $1,000.00/week

**Employer:** Think Tank
**Job Title:** Casting Associate
**Duties:** Coordinated and conducted interviews
**Salary:** $600.00/week

**Employer:** Entertainment Partners- New Orleans
**Job Title:** Casting/Production Coordinator
**Duties:** Located individuals for TV shows and assisted in production of shows
**Salary:** $2,300.00/week

Mr. Macy reported the following work history at the time of injury:

**Employer:** Cooper T. Smith
**Title:** Lineman/Dock worker
**Duties:** Tied up ships along the river
**Schedule:** 24 hrs. on/ 48 hrs. off averaging approx. 72 hours per week
**Employment Dates:** 01/2011 to 12/16/15
**Ending Salary:** $$65,000.00- $66,000.00/year

Mr. Macy reported the following work history since the time of injury:

**Employer:** Cintas Boat Works
**Job Title:** Sander/Painter
**Duties:** Sanded, painted, and cleaned the bottoms of boats
**Dates:** 2 months beginning around May 2018
**Reason for leaving:** Too physically demanding; missed work each week
**PT/FT:** FT
**Salary:** $300.00 - $400.00/week

**Employer:** Unglesby Williams
**Job Title:** Paralegal
**Duties:** Talks with clients, orders medical records, and updates spreadsheets
**Dates:** 07/2018 - present
**PT/FT:** FT
**Salary:** $38,000.00/year

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **6** of **21**

Mr. Macy reported that a friend hired him to help him out. He indicated that this job offers flexibility to accommodate his restrictions. Mr. Macy reported that while he is currently employed as a *paralegal*, he does not believe he would like to remain in this career.

According to Mr. Macy's individual income tax returns, he earned the following:

| Year | Earnings |
|------|----------|
| 2013 | $57,075.00 |
| 2014 | $62,340.00 |
| 2015 | $65,404.00 |

## ANALYSIS OF RECORDS REVIEWED

**Date of Injury:** 12/16/15

**Type/Location of Injury:** Work related/Shoulders and Neck

**Medical Opinions Reviewed:**

**Pre-Existing Injury:**

**Michael O'Brien, MD:**
On 11/01/11, Mr. Macy was evaluated for a right shoulder injury, which had occurred on 02/27/11. Dr. O'Brien reported that Mr. Macy had continued working full-time since the injury. According to Dr. O'Brien, Mr. Macy reported shoulder weakness; however, he did not have numbness or tingling. Dr. O'Brien recommended physical therapy and noted that if Mr. Macy's pain did not improve surgery may be an option. Dr. O'Brien reported that Mr. Macy could continue to work full-duty.

On 12/06/11, Dr. O'Brien diagnosed closed dislocation of the acromioclavicular joint and added an additional diagnosis of superior glenoid labrum lesions of the right shoulder. Dr. O'Brien reported that if Mr. Macy continued with complaints of pain after physical therapy, surgery for arthroscopic bicep tenodesis and distal clavicle resection would be recommended.

**Medical Opinions Reviewed:**

**Following 12/16/15 Injury:**

**Aaron Dumont, MD:**
On 01/21/16, Mr. Macy was evaluated for neck pain by Dr. Dumont, who diagnosed cervical radiculopathy with parasthesia of the right arm. Dr. Dumont recommended physical therapy and reported that depending on Mr. Macy's progress, he may benefit from a two-level ACDF. Mr. Macy's MRI demonstrated C5-6 and C6-7 disc herniations, which appeared to compress the right-sided nerve root.

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **7** of **21**

On 02/04/16, Dr. Dumont recommended that Mr. Macy undergo a C5-6 epidural steroid injection and noted that Mr. Macy may benefit from a one- vs. two-level ACDF or possible arthroplasty depending on his progress.

On 03/24/16, Dr. Dumont reported that Mr. Macy underwent the cervical ESI on 03/07/16; however, Mr. Macy did not experience any pain relief.

On 08/31/17, Mr. Macy was evaluated by Dr. Dumont following cervical disc replacement. According to Dr. Dumont, Mr. Macy had recently undergone a CT myelogram, as well as an EMG/NCS. Dr. Dumont reported that Mr. Macy had residual deficits largely in the right C6 and C7 distribution. According to the diagnostic exams, there was no evidence of nerve-root or spinal cord compression, no active denervation, and no evidence of entrapment. Dr. Dumont opined that Mr. Macy had reached maximum medical improvement and recommended a functional capacity evaluation.

**Felix Savoie, MD:**
On 05/06/16, Mr. Macy underwent an evaluation by Dr. Savoie, who diagnosed right shoulder pain and recommended shoulder imaging.

On 08/22/16, Dr. Savoie reported that Mr. Macy's right shoulder was not doing well despite spine surgery; and he reported that Mr. Macy's shoulder was protracted and asymmetrical. Dr. Savoie recommended an evaluation with Dr. Lundgren to map out non-working and working muscles of the shoulder.

On 10/03/16, Dr. Savoie reported that EMG with Dr. Lundgren showed C6 and C7 neuropathy; however, it appeared that it would recover. Dr. Savoie ordered physical therapy but deferred to the neurosurgeon regarding work and prescriptions.

On 02/18/17, Dr. Savoie reported that Mr. Macy's shoulder was still weak. Mr. Macy also underwent an evaluation by a neurosurgeon and had been completely released, but still had neuropathy and weakness. Dr. Savoie reported that a recent myelogram showed normal results and that Mr. Macy's job had been terminated since he could not perform the job duties.

On 04/04/17, Mr. Macy presented with left shoulder pain and bilateral scapular pain. Dr. Savoie diagnosed scapular dyskinesis. At that time, Dr. Savoie performed a left shoulder injection.

On 05/22/17, Dr. Savoie reported that both shoulders were improving and indicated that the left shoulder should fully recover; however, he noted that the right shoulder still had weakness and that the muscles were still recovering. Dr. Savoie opined that Mr. Macy's options were to maintain yearly visits for the right shoulder or anticipate a rotator cuff tear repair if one occurred before the muscles fully recovered from the neck surgery.

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **8** of **21**

On 07/18/17, Dr. Savoie reported that Mr. Macy's left shoulder was okay to use as tolerated; however, Mr. Macy continued to have muscle and nerve dysfunction related to the right shoulder. Dr. Savoie opined that Mr. Macy could not return to heavy-duty work due to the weakness and dysfunction. Dr. Savoie noted that Mr. Macy was at a very high risk of tearing if his strength did not return. Dr. Savoie recommended a second opinion from Dr. Dumont.

On 07/28/17, Mr. Macy presented with left shoulder pain and left elbow pain. Dr. Savoie recommended left elbow diagnostic imaging and performed a left shoulder injection. Dr. Savoie also diagnosed tendonitis of the left shoulder.

On 11/16/17, Dr. Savoie performed a left shoulder injection and indicated that he planned to perform them every four to six months. Regarding Mr. Macy's right shoulder, Dr. Savoie indicated that Mr. Macy would eventually require a rotator cuff repair with decompression, distal clavicle excision, with possible bicep tenodesis; then years later, a revision repair with bicep tenodesis if it is not done prior; and then years later, a replacement if the muscles and nerves do not recover. Dr. Savoie reported that Mr. Macy's left shoulder should require an arthroscopic rotator cuff repair with bicep tenodesis decompression and distal clavicle with labral repair.

On 07/19/18, Mr. Macy presented with right and left shoulder inflammation, as well as neck pain. Dr. Savoie performed bilateral shoulder injections and recommended a re-evaluation by a neurosurgeon for Mr. Macy's neck.

**Christopher Maulucci, MD:**
On 05/10/16, Mr. Macy was evaluated for cervical radiculopathy.

On 05/18/16, Mr. Macy underwent a C5-6 and C6-7 total disc arthroplasty, performed by Dr. Maulucci.

On 06/07/16, Dr. Maulucci reported that Mr. Macy's radicular pain had subsided and noted mild numbness in Mr. Macy's right thumb. Mr. Macy's chief complaint was difficulty with right shoulder abduction. Dr. Maulucci opined that Mr. Macy's shoulder issue was a combination of pre-existing injury and surgical positioning, and he noted that Mr. Macy should return to his pre-operative status.

On 07/12/16, Dr. Maulucci recommended physical therapy.

On 08/23/16, Dr. Maulucci opined that Mr. Macy would not reach MMI for at least one year after surgery and reported that Mr. Macy was not ready to return to work at full capacity; however, Mr. Macy should continue with light-duty.

On 10/18/16, Dr. Maulucci reported that from a cervical spinal stability standpoint Mr. Macy was cleared to perform any and all activities at work; however, from a neurological standpoint, Mr. Macy was unable to perform prior duties due to right upper extremity weakness. Dr. Maulucci agreed with Dr. Savoie that Mr. Macy would reach MMI from a neurodegeneration

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **9** of 21

standpoint by two years; however, at the one-year mark post-operatively Mr. Macy would have obtained the majority of his improvement.

On 01/24/17, Dr. Maulucci reported that Mr. Macy had reach MMI from a cervical spine perspective.

On 01/23/18, Mr. Macy presented with neck pain and right arm weakness.  Dr. Maulucci reported that Mr. Macy was at risk of developing adjacent segment disease above or below the disc replacements and opined that Mr. Macy could realistically require a revision neck surgery over the next 10 to 20 years.

On 10/10/18, Dr. Maulucci reported that Mr. Macy appeared to have CT radiculopathy or temporal neuralgia, and Mr. Macy was referred to pain management for an injection.
Dr. Maulucci believed that Mr. Macy had a transient left C6 radiculopathy, which he noted would improve over time.

**Functional Capacity Evaluation by ISR Physical Therapy:**
On 09/25/17, Mr. Macy underwent an FCE performed by Marc Cavallino, PT, OCS. Mr. Cavallino indicated that Mr. Macy could perform at a light to medium physical demand level with occasional lifting up to 20-40 lbs., occasional carrying up to 30 to 40 lbs., and frequent lifting up to 10 to 20 lbs. Mr. Cavallino also noted that Mr. Macy would be limited to occasional overhead activities, crawling, and ladder climbing. He also opined that Mr. Macy would be unable to return to his previous employment as a *lineman*.

**Eric Oberlander, MD:**
Dr. Oberlander reported that he examined Mr. Macy on 12/18/19 and 01/03/19. Dr. Oberlander recommended an updated CT myelogram to determine the progression of Mr. Macy's condition. Dr. Oberlander recommended a removal and revision of the C5-6 and C6-7 discs and convert them to an ACDF, which may require a corpectomy.

***Consultation with Dr. Oberlander:***
Consultation was held with Dr. Oberlander on 01/15/19 to obtain his opinions regarding Mr. Macy's future medical care needs, as well as his physical restrictions and limitations as a result of the 12/16/15 incident. Dr. Oberlander's recommendations are outlined in the life care plan section of this report. Dr. Oberlander deferred to the FCE regarding Mr. Macy's physical limitations.

## VOCATIONAL TESTING

Vocational testing was administered with the following results:

**Kaufman Brief Intelligence Test – II (K-BIT-II):**

The K-BIT-II is a brief measure of intelligence.  Mr. Macy scored as follows:

| Subtest | Subtest Standard Score | Confidence Interval | Percentile Rank | Descriptive Category |
|---|---|---|---|---|
| Verbal | 110 | 102-117 | 75 | Average |
| Nonverbal | 102 | 94-110 | 55 | Average |
| *IQ Composite* | | | | |
| Sum of Subtest Standard Scores | Composite Standard Score | Confidence Interval | Percentile Rank | Descriptive Category |
| 106 | 212 | 212 | 66 | Average |

**Woodcock Johnson IV (WJIV):**

The WJIV is used as a measure of academic achievement. Mr. Macy scored as follows:

| Subtest | Subtest Standard Score | Confidence Interval | Percentile Rank | Grade Equivalent | Descriptive Category |
|---|---|---|---|---|---|
| Reading Composite | 102 | 97-108 | 56 | 17.4 | Average |
| *Letter-Word Identification* | 102 | 95-109 | 55 | 17.2 | Average |
| *Passage Comprehension* | 103 | 95-111 | 58 | 16.3 | Average |
| Math Composite | 91 | 86-96 | 28 | 7.7 | Average |
| *Applied Problems* | 96 | 89-103 | 40 | 11.0 | Average |
| *Calculation* | 88 | 91-94 | 20 | 6.5 | Low Average |

**Career Decision-Making System - Rvsd (CDM-R):**

The CDM-R is an occupational interest inventory. Mr. Macy scored highest on the Scientific and Arts scales.

A high score on the Scientific Scale suggests that Mr. Macy thinks math and science are important, is curious and creative, and is interested in theory.

A high score on the Arts Scale suggests that Mr. Macy enjoys being independent, likes to express himself creatively, and likes music, writing, drawing, and entertainment.

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **11** of **21**

## Work Motivation Scale (WMS):

The WMS helps to explore values and motives and how they affect work. Mr. Macy's responses indicated that his top work values include the following: Earnings and Benefits, Success Orientation, and Working Conditions. Work motives are closely related to work values. Work values help shape the motivational forces that drive individuals. Knowing what motivates individuals most can be useful when making career decisions, as well. Mr. Macy's top work motives include the following: Survival and Safety Motives and Fulfillment Motives.

## Job Search Attitude Inventory (JSAI):

The JSAI helps identify key attitudes held about looking for a job. Mr. Macy scored in the Self-Directed range on the Uninvolved vs. Involved and Help from Others vs. Self Help scales. He scored Average on the Luck vs. Planning, Passive vs. Active, and Pessimistic vs. Optimistic scales.

## Transferable Skills Scale (TSS):

The TSS is designed to help identify one's strongest transferable skills. Mr. Macy scored Average on the Analytical, Interpersonal, Organizational, Physical, Informational, and Creative scales.

An average score on the Analytical Scale suggests that Mr. Macy believes he has developed some of the transferable skills used in discovering, collecting, and analyzing information. These skills are in important in fields such as psychology, life sciences, and social sciences.

An average score on the Interpersonal Scale suggests that Mr. Macy has developed some of the transferable skills used when interacting with other people and relating to them on a personal level. These skills are important in fields such as teaching, nursing, social work, and counseling.

An average score on the Organizational Scale suggests that Mr. Macy believes he has developed some of the transferable skills used in managing people in a group or organization. These skills are important in fields such as business administration, management, law, human resource management, and marketing.

An average score on the Physical Scale suggests that Mr. Macy believes he has developed some of the transferable skills used in working with tools, technology, and equipment. These skills are important in the fields such as construction, manufacturing, mechanics, and carpentry.

An average score on the Informational Scale suggests that Mr. Macy believes that he has developed some of the transferable skills used to organize and process information, and coordinate activities. These skills are important in fields such as computer science, business analysis, office management, and secretarial science.

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **12** of **21**

An average score on the Creative Scale suggests that Mr. Macy believes that he has developed some of the transferable skills used to express feelings and ideas through the creation of original works. These skills are important in fields such as fine art, music, theater, graphic design, and writing.

## VOCATIONAL ANALYSIS

Based on Mr. Macy's work history, he has worked in sedentary to very heavy, unskilled to skilled occupations, requiring an average general educational development. He has gained skills and abilities, which are generally transferable in the labor market, including the following: *communicating and performing before audiences with poise and self-confidence: directing presentations and instructing actors and students; memorizing dialogue, interpreting roles, and conveying ideas and emotions through body movements, voice inflection, and facial expression; having good physical and mental stamina to endure long rehearsals and performances; knowing habits and physical needs of specific types of animals; using hands, eyes, feet, and body to care for and train;; engaging in required physical work to keep surroundings (such as pet shops, zoos, circuses, aquariums, and racing stables) clean; observing animals for change in health and condition; working with hands and using assortment of hand tools; operating various kinds of equipment; knowing how to operate motor vehicles or control movement of marine craft; coordinating eyes, hands, and feet to control movement of vehicle or craft on roads or waterways; observing traffic regulations; using arithmetic for collecting delivery receipts or money; and using common sense and basic language and math skills to carry out instructions, total costs, make change, and complete forms.*

According to Mr. Macy's work history, he demonstrated **above average** aptitudes in general learning ability, verbal ability, form perception, clerical perception, motor coordination, and finger dexterity. He demonstrated **average** aptitudes in numerical ability, spatial ability, manual dexterity, eye/hand/foot coordination, and color discrimination. He has demonstrated an ability to compare, copy, compute, compile, analyze, take instructions, help, serve, speak, signal, handle, feed, off bear, tend, manipulate, drive, operate, and control. Mr. Macy has demonstrated an ability to direct or control; perform repetitive work while performing a variety of duties; work in situations requiring the precise obtainment of set limits, tolerances, or standards; deal with people; and make judgments and decisions. He has demonstrated an interest in dealing with things and objects; performing routine, simple work with machines or processes resulting in tangible productivity. He has worked in fields of *animal propagating, accommodating, health caring/medical, cooking/food preparing, material moving, transporting, hunting/fishing, cleaning, pumping, entertaining, and verbal recording/record keeping.*

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **13** of **21**

### *OPINIONS:*

This vocational analysis is based on trait factor theory and vocational diagnosis and assessment of residual employability. Mr. Macy's vocational profile was assessed, as well as his vocational capacity. Standardized vocational testing was also completed.

In formulating an opinion regarding Mr. Macy's rehabilitation potential, employability, and expected earnings, his ability to return to his past occupation is the first outcome considered. If it is determined that he is unable to return to his prior occupation, consideration is then given regarding his ability to return to jobs that he has held in his past work history, as returning to employment previously held allows for an easier adjustment and transition back into the labor market. Additionally, research is conducted regarding alternate types of jobs that exist in the labor market that Mr. Macy may be capable of performing. Typically, differing medical opinions are noted, and all opinions were considered in this matter as follows:

On 05/18/16, Mr. Macy underwent a cervical disc replacement performed by Dr. Maulucci. Mr. Macy was limited to light-duty with no lifting more than 5 lbs. On 08/24/16, Dr. Maulucci noted that Mr. Macy would likely not reach maximum medical improvement until one year post-operatively and recommended that he remain at light-duty. On 01/23/18, Dr. Maulucci reported that Mr. Macy may eventually require a right shoulder replacement and a revision neck surgery within the next 10 to 20 years.

In his report of 02/18/17, Dr. Savoie reported that Mr. Macy had been terminated since he could not perform the job duties of a *lineman.* On 07/18/17, Dr. Savoie indicated that Mr. Macy could not return to heavy-duty work secondary to weakness and dysfunction. On 11/16/17, Dr. Savoie performed a left shoulder injection and indicated that he planned to perform them every four to six months. Regarding Mr. Macy's right shoulder, Dr. Savoie indicated that Mr. Macy would eventually require a rotator cuff repair with decompression, distal clavicle excision, with possible bicep tenodesis; then years later, a revision repair with bicep tenodesis if it is not done prior; and then years after that, a replacement if the muscles and nerves do not recover.  Dr. Savoie reported that Mr. Macy's left shoulder should require an arthroscopic rotator cuff repair with bicep tenodesis decompression and distal clavicle with labral repair.

On 09/25/17, Mr. Macy underwent an FCE performed by Marc Cavallino, PT, OCS. Mr. Cavallino indicated that Mr. Macy could perform at a light to medium physical demand level with occasional lifting up to 20-40 lbs., occasional carrying up to 30 to 40 lbs., and frequent lifting up to 10 to 20 lbs. Mr. Cavallino also noted that Mr. Macy would be limited to occasional overhead activities, crawling, and ladder climbing. He also opined that Mr. Macy would be unable to return to his previous employment as a *lineman.*

On 01/14/19, Dr. Oberlander recommended an updated CT myelogram to determine the progression of Mr. Macy's condition. During consultation with Dr. Oberlander, he recommended that should the CT myelogram indicate further worsening of the replaced disc, Mr. Macy would be a candidate for a revision surgery. Dr. Oberlander deferred to the FCE regarding Mr. Macy's physical restrictions.

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **14** of **21**

At the time of injury, Mr. Macy was employed as a *lineman*, which is considered **very heavy** in physical strength demand according to the United States Department of Labor's *Dictionary of Occupational Titles*. According to the Bureau of Labor Statistics, wages for this position range from $10.92 to $17.26 per hour (25th to 75th percentile), with median wages of $13.58 per hour (50th percentile). According to Mr. Macy, he was earning $14.63 per hour ($65,000.00 to $66,000.00 per year). According to Mr. Macy's individual income tax returns, he was earning between $57,075.00 to $65,404.00 per year from the years 2013 to 2015.

Mr. Macy reported that at the time of injury, he was training to be able to operate the boats that bring the lines to the docks. He indicated that while this was a less physically demanding position than that of a lineman, because of his injury and subsequent limitations, he is now unable to work his way up to that position. According to the Bureau of Labor Statistics, wages for a *boat operator* range from $23.24 to $28.85 per hour (25th to 75th percentile), with median wages of $26.23 per hour (50th percentile). According to Mr. Macy, the *boat operator* position requires the same schedule as a *lineman* (average of 72 hours per week); however, he reported that due to the limited number of *boat operators*, he would have likely been able to work additional hours and overtime.

Mr. Macy reported that he is currently employed as a *paralegal;* however, his job duties and reported earnings fit more in line with the occupation of *legal secretary* which is considered sedentary level work according to the *Dictionary of Occupational Titles*. Mr. Macy reported earning approximately $38,000.00 per year in his current job. According to the Bureau of Labor Statistics, wages for a *legal secretary* range from $12.95 to $23.52 per hour (25th to 75th percentile) ($26,936.00 to $48,921.60 per year based on a 40-hour work week), with median wages of $19.30 per hour (50th percentile) ($40,144.00 per year based on a 40-hour work week).

Based on the FCE, Mr. Macy is unable to return to work as a *lineman*. Mr. Macy may be capable of working in occupations at a light to partial range of medium physical demand level in alternate occupations.

The alternate occupations outlined below are based on Mr. Macy's vocational profile, which includes his age, education, past work history, transferable skills, vocational test results, and physical capabilities as outlined in the records. The chart outlines the occupation, physical strength demand, annual wage ranges, and median annual wages for these occupations. This is a representative sample of some of the types of jobs that Mr. Macy may be capable of performing, and not an all-inclusive list.

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **15** of **21**

## Past/Alternate Occupations

| Occupation | Physical Strength Demand | Annual Wage Ranges* | Median Annual Wage* |
|---|---|---|---|
| Data Entry Clerk | Sedentary | $20,092.80 - $32,947.20 | $24,918.40 |
| Order Clerk | Sedentary | $28,516.80 - $39,977.60 | $34,278.40 |
| File Clerk | Light | $22,214.40 - $29,785.60 | $24,939.20 |
| Bartender Helper** | Medium | $17,638.40 - $22,984.00 | $19,593.60 |
| Legal Secretary | Sedentary | $26,936.00 - $48,921.62 | $40,144.00 |

* Wages are according to the Bureau of Labor Statistics
**Denotes past occupations; assistance may need to be provided to accommodate his restrictions


Based on a 40-hour work week, wages in these occupations range from $17,638.40 to $48,921.62 per year, with median wages ranging from $19,593.60 to $40,144.00 per year. Starting wages range from $17,638.40 to $28,516.80 per year. Based on his vocational profile, Mr. Macy would likely earn closer to the starting to median wage ranges in alternate occupations, and with time and experience, he can increase his earnings.

Mr. Macy's pre-injury and post-injury earnings have been assessed. Based on the information provided, I believe that Mr. Macy's vocational prognosis is **good.**


## LIFE CARE PLAN

Life care planning involves consideration of recommendations from physicians and allied health professionals to determine an individual's current and future medical needs related to an event or occurrence. The medical recommendations considered in a Life Care Plan are those recommendations that are deemed a medical necessity with greater than 50% chance of being needed. To accurately fund future care, the frequency and duration of recommended treatment needs to be determined.

The following are cost estimates associated with Mr. Macy's medical care needs and are specific to his treatment as it relates to his injuries sustained on 12/16/15. The recommendations are based on a review of medical records, consultation with Dr. Oberlander, information gathered during the interview with Mr. Macy, and research regarding the standards of care for this type of injury. This is a dynamic document and amendments can be made as needed, based on his changing needs or additional information.

I am currently awaiting correspondence/consultation from Dr. Savoie. Once I am in receipt of his additional recommendations, I will amend my report as necessary.

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **16** of **21**

### FUTURE MEDICAL CARE, ROUTINE:

| Service or Item | Purpose | Duration | Frequency | Cost/Unit | Cost/Year | Comments |
|---|---|---|---|---|---|---|
| Neurosurgeon | Routine care | Life Expectancy | Every 6 months for 2-3 years THEN 1 visit/year | Initial visit: $250.00 - $750.00* Follow-up visits: $380.00 - $3,000.00* (Based on $95.00 - $500.00/visit) | $95.00 - $500.00 | Per Dr. Oberlander should Mr. Macy not undergo disc revision surgery. |

*One-time only or short-term cost

*Subtotals for Future Medical Care, Routine:*
*Short term/One-time costs: $630.00 - $3,750.00*
*Annual costs to begin at age 37 or age 38:  $95.00 - $500.00*

### PROJECTED EVALUATIONS:

| Service or Item | Purpose | Duration | Frequency | Cost/Unit | Cost/Year | Comments |
|---|---|---|---|---|---|---|
| Pain Management | To determine treatment with a pain specialist | Life Expectancy | Once | $250.00 - $500.00* | N/A | Per Dr. Oberlander. |
| Psychological | To determine needs for therapy | Life Expectancy | Once | $150.00 - $275.00* | N/A | According to Mr. Macy, he was receiving psychotherapy; however, he had been unable to continue due to insurance changes. An evaluation is included to determine needs for treatment. |

*One-time only or short-term cost

*Subtotals for Projected Evaluations:*
*Short term/One-time costs: $400.00 - $775.00*
*Annual costs:  N/A*

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **17** of **21**

### *THERAPEUTIC MODALITIES:*

| Service or Item | Purpose | Duration | Frequency | Cost/Unit | Cost/Year | Comments |
|---|---|---|---|---|---|---|
| Physical Therapy | To maintain physical functioning | Life Expectancy | 24 visits/year | Initial visit: $120.00 - $160.00 THEN Follow-up visits: $75.00 - $125.00 | $1,920.00 - $3,160.00 | Per Dr. Oberlander should Mr. Macy not undergo disc revision surgery. |

*One-time only or short-term cost

**Subtotals for Therapeutic Modalities:**
**Short term/One-time costs: N/A**
**Annual costs:  $1,920.00 – $3,160.00**

### *LABORATORIES/DIAGNOSTICS:*

| Service or Item | Purpose | Duration | Frequency | Cost/Unit | Cost/Year | Comments |
|---|---|---|---|---|---|---|
| CT Myelogram | To determine potential worsening of condition | Life Expectancy | Once | $4,972.00 - $11,549.00* | N/A | Per Dr. Oberlander. |
| Cervical X-Ray | Routine diagnostics | Life Expectancy | 1 study/year | $415.00 - $730.00 | $415.00 - $730.00 | Per Dr. Oberlander. |
| Cervical MRI | Routine diagnostics | Life Expectancy | Every 5 years | $2,976.00 - $6,405.00 | $595.20 - $1,281.00 | Per Dr. Oberlander |

*One-time only or short-term cost

**Subtotals for Laboratories/Diagnostics:**
**Short term/One-time costs: $4,972.00 – $11,549.00**
**Annual costs:  $1,010.20 – $2,011.00**

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **18** of **21**

### *SURGERIES/PROCEDURES:*

| Service or Item | Purpose | Duration | Frequency | Cost/Unit | Cost/Year | Comments |
|---|---|---|---|---|---|---|
| Right Shoulder Rotator Cuff Repair with Decompression, Distal Clavicle Excision, with/without Bicep Tenodesis | Surgical needs | Life Expectancy | Once | $39,576.19 – $49,986.51* | N/A | Per Dr. Savoie's note dated 11/16/17. It is unknown at this time whether Mr. Macy will require an arthroscopy to include a bicep tenodesis; therefore, a range of total costs has been provided.<br><br>Costs include lab work/diagnostics, facility fees, physician fees, and anesthesia fees. |
| Left Shoulder Arthroscopic Rotator Cuff Repair with Bicep Tenodesis, Decompression, Distal Clavicle Excision, and Labral Repair | Surgical needs | Life Expectancy | Once | $44,557.19 – $54,176.77* | N/A | Per Dr. Savoie's records.<br><br>Per Dr. Savoie's note dated 11/16/17. Costs include lab work/diagnostics, facility fees, physician fees, and anesthesia fees. |
| *Right Shoulder Bicep Tenodesis\*\** | *Surgical needs* | *Life Expectancy* | *Once* | *$43,252.46 – $58,251.39 \*\** | *N/A* | *Per Dr. Savoie's note dated 11/16/17.*<br><br>*Dr. Savoie indicated that this procedure would be required if Mr. Macy did not undergo this procedure in the first arthroscopy. Since it cannot be determined if this procedure would be required separately, this cost is included for informational purposes.*<br><br>*Costs include lab work/diagnostics, facility fees, physician fees, and anesthesia fees.* |

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **19** of **21**

| Service or Item | Purpose | Duration | Frequency | Cost/Unit | Cost/Year | Comments |
|---|---|---|---|---|---|---|
| *Right Shoulder Replacement\*\** | *Surgical needs* | *Life Expectancy* | *Once* | *$57,962.32 - $69,696.43\*\** | *N/A* | *Per Dr. Savoie's note dated 11/16/17.*<br><br>*Dr. Savoie indicated that "a replacement of some kind" would be required "if the nerves and muscles do not recover." Since it is unknown with a degree of medical certainty that this procedure would be required, the cost is included for informational purposes.*<br><br>*Costs include lab work/diagnostics, facility fees, physician fees, and anesthesia fees.* |

*\*One-time only or short-term cost*                                    *\*\*For informational purposes only*

***Subtotals for Surgeries/Procedures:***
***Short term/One-time costs: $84,133.38 - $104,163.28***
***Annual costs:  N/A***

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **20** of **21**

### *MEDICATIONS:*

Medications outlined below are based on Mr. Macy's current medications regimen and may change in the future based on his changing needs.

| Medication | Dosage | Frequency | Cost/Unit | Cost/Year | Comments |
|---|---|---|---|---|---|
| Tramadol | 50 mg | 720 tablets (based on 1 tablet every 6 hours for 6 months) | $288.00 - $763.20* (based $0.40 - $1.06/tablet) | N/A | Per Dr. Oberlander. |
| Robaxin | 750 mg | 540 tablets (based on 1 tablet every 8 hours for 6 months) | $286.20 - $378.00* (based on $0.53 - $0.70/tablet) | N/A | Per Dr. Oberlander. |

*Subtotals for Medications:*
*Short term/One-time costs: $574.20 - $1,141.20*
*Annual costs:  N/A*

### *SUMMARY OF COSTS:*

| | Low | High |
|---|---|---|
| One-Time Only/Short-Term Costs: | $90,709.58 | $121,378.48 |
| Annual Costs: | $2,930.20 | $5,171.00 |
| Additional annual costs to begin at age 37 or 38: | $95.00 | $500.00 |

According to the National Vital Statistics Reports, the expectation of remaining life at age 35 for males is **43.2 years**. This life expectancy has been used to demonstrate the total future medical costs noted below. The total costs are based on current costs for services/items, assuming the annual costs are necessary through life expectancy. These costs have not been adjusted to include rate of inflation or discounted value.

Geoffrey Ormsby, Esq.
Re: Shane Macy
Page **21** of **21**

| Total Costs Summary: | Low | High |
|---|---|---|
| Future medical care routine: | $4,449.00 | $24,350.00 |
| Projected evaluations: | $400.00 | $775.00 |
| Projected therapeutic modalities: | $82,944.00 | $136,512.00 |
| Labs/Diagnostics: | $48,612.64 | $98,424.20 |
| Surgeries/Procedures: | $84,133.38 | $104,163.28 |
| Medications: | $574.20 | $1,141.20 |
| **Total Costs:** | **$221,113.22** | **$365,365.68** |

Dr. Oberlander indicated that the cervical disc replacement revision is currently a possibility depending on the results of the CT myelogram. Should the cervical disc replacement revision be deemed more probable than not, the above plan would change as follows:

- **Cervical disc replacement revision** would be included, increasing the plan by $191,866.29 to $203,720.70.
- **Neurosurgeon** visits would be changed to a one-time cost of $820.00 to $3,750.00 (6 post-operative visits) with an annual cost of $95.00 to $500.00.
- **Physical therapy** visits would be changed to a one-time cost of $720.00 to $1,660.00 (8-12 post-operative visits).
- **Robaxin 750 mg** costs would change to $47.70 to $63.00.

This life care plan represents requirements as I understand them, as determined through research with suppliers, vendors, care providers, and others. On occasion, practicality and feasibility prevent the direct observation and/or gathering of objective, quantifiable data. For this reason, a best estimate may have been used. This life care plan is a dynamic document and can be amended at any time, based on Mr. Macy's changing needs and additional information.

Thank you for the opportunity to assist in this matter, and should you require any additional information or assistance, please do not hesitate to contact me.

Sincerely,

Todd S. Capielano M.Ed., LRC, CRC, CCM, LPC, CLCP
Licensed Rehabilitation Counselor & Certified Life Care Planner

# AsherMeyers, LLC

## DISPUTE ADVISORY & FORENSIC SERVICES

January 23, 2018

Mr. J. Geoffrey Ormsby
Smith & Fawer, LLC
201 St. Charles Avenue
Suite 3702
New Orleans, Louisiana 70170

Re:   Shane Macy

Dear Mr. Ormsby:

You have asked us to calculate the loss of economic capacity and the present value of future medical expenses in the above referenced matter.

Shane Macy is a Caucasian male born on September 10, 1983.  He was injured as a result of the alleged actions of the defendants on December 16, 2015.

Materials Reviewed

1.   2013 through 2015 U.S. Individual Income Tax Returns ("Tax Returns")

2.   Report dated January 23, 2019 by Todd Capielano ("Capielano Report")

3.   U.S. Department of Labor Report of Earnings dated August 3, 2018

4.   Payroll Report for 2018 Employment with Unglesby & Williams

5.   Correspondence dated December 28, 2018 from Geoffrey Ormsby

Earnings Base

*Pre-Accident Earning Capacity*

Mr. Macy's average 2013 through 2015 normalized net earnings (as reflected on his Tax Returns) total $56,404.  We have used that amount as his pre-accident annual earning capacity as of the date of the accident.

*Post-Accident Earning Capacity*

Based on the Capielano Report, Mr. Macy's post-accident annual earning capacity as of this report date totals $40,144 (based on the median wages for a legal secretary outlined in the Capielano Report).

EXHIBIT

*B*

Mr. J. Geoffrey Ormsby
January 23, 2019
Page 2

Mr. Macy had no earnings from the date of the accident through February 20, 2018. Based on the U.S. Department of Labor Report of Earnings and the 2018 Payroll Report referenced above, Mr. Macy earned $24,839 in 2018.

Change in Future Income

We have used a growth factor of 2.23% in calculating the annual changes in earning capacity beginning in 2019.

Discount Rate

This factor is based upon the rate of return available in risk-free investments (primarily short term and intermediate term U.S. Treasury Securities). The purpose of using this mechanism is to insure that there is a sufficient total amount of cash today to replace future losses incurred. For purposes of this report, we have utilized a discount rate of 2.23%.

Worklife

We have calculated Mr. Macy's loss of future earnings based on a worklife expectancy of 25.7 years as of the reference date of this report (May 20, 2019), or until attaining age 61.4. For this assumption, we have relied upon Life and Worklife Expectancies, Second Edition authored by Hugh Richard, M.S. and Michael Donaldson, Ph.D., Table 4.

Future Medical Costs

Based on the Capielano Report, Mr. Macy will incur various annual expenses totaling $4,348 and one-time expenses totaling $106,184. There may be additional costs which are properly considered but have not been included in our calculations.

We have assumed that the annual growth rate of Mr. Macy's future medical expenses relating to these costs to be 3.23% (1% real growth net of inflation).

Life Expectancy

We have calculated Mr. Macy's life expectancy to be 42.8 years as of the reference date of this report, or until attaining age 78.5. For this assumption, we have relied upon Life and Worklife Expectancies, Second Edition authored by Hugh Richard, M.S. and Michael Donaldson, Ph.D., Table 1.

Mr. J. Geoffrey Ormsby
January 23, 2019
Page 3

Summary

Based on the above and as summarized on Exhibit 1, we have calculated Mr. Macy's loss of economic capacity and future medical costs to total $939,567.

This report has been authored by Harold A. Asher and Jeffrey E. Meyers.

We reserve the right to amend this report should additional relevant information come to our attention.

Mr. J. Geoffrey Ormsby
January 23, 2019
Page 4

Harold A. Asher does hereby state the following:

In accordance with Rule 26 of the Federal Rules of Civil Procedure, I do hereby state the following:

I have not authored any publications within the preceding 10 years.

I expect to be compensated for my work according to my standard fee schedule, which is $465 per hour, with the exception of court time and depositions, for which my standard rate is $930 for the first hour and $465 for each additional hour.

I have testified as an expert at trial and/or been deposed within the preceding four years in the following matters:

Board of Supervisors of Louisiana State University and Agricultural and Mechanical College v Marshall G. Gerson, Ellvog, Inc. and City of New Orleans
*Civil District for the Parish of Orleans* (trial testimony January 2015)

Michelle D. Allen-Hart, et al v Abbott Simses, PLC, et al
*Civil District for the Parish of Orleans* (deposition January 2015)

MAPP Construction, LLC v Chenevert Architects, et al
*19th Judicial District Court for the Parish of East Baton Rouge* (deposition February 2015)

Lillie Rea and Hilda Wiratunga v Wisconsin Coach Lines, Inc. et al
*United States District Court for the Middle District of Louisiana* (trial testimony March 2015)

Julie Patino v Dillard University
*Civil District Court for the Parish of Orleans* (trial testimony April 2015)

Richard L. Rubin and Mary Rubin v The American Insurance Company, Paramount Remodeling & Roofing Corp., First Financial Insurance Company and C&G Construction of Louisiana, Inc.
*24th Judicial District Court for the Parish of Jefferson* (trial testimony May 2015)

In the Matter of the Complaint of Crosby Marine Transportation, LLC and Crosby Tugs, L.L.C. as Owners and Owners Pro Hac Vice of the M/V Crosby Mariner Petitioning for Exoneration from or Limitation of Liability
*United States District Court for the Western District of Louisiana, Lafayette/Opelousas Division* (trial testimony June 2015)

Mr. J. Geoffrey Ormsby
January 23, 2019
Page 5

Choice Professional Overnight Copy Service, Inc. v Galeas, c/w Broussard v Choice Professional Overnight Copy Service, Inc.
*Civil District for the Parish of Orleans* (deposition May 2015 and trial testimony June 2015)

Lorenzo O. McElroy and Donna S. McElroy, et al v Emergency Room Group, Ltd, et al
*In the Circuit Court of Jackson County, Mississippi* (trial testimony September 2015)

Michael Sartisky v Louisiana Endowment for the Humanities
*United States District Court for the Eastern District of Louisiana* (deposition October 2015)

Timothy L. Chandler v United States of America and Nathaniel B. Greene, Sr.
*United States District Court for the Western District of Louisiana* (deposition November 2015)

Larry Warner and Ava Warner v USAA General Indemnity Insurance Company, Canal Insurance Company and Patrick Alexis
*24th Judicial District Court for the Parish of Jefferson* (trial testimony January 2016)

Stryker Corporation, et al v Christopher Ridgeway, at al
*United States District Court for the Western District of Michigan, Southern Division* (trial testimony February 2016)

FIE, LLC v New Jax Condominium Association, Inc. and Earl Weber, Jr.
*Civil District Court for the Parish of Orleans, State of Louisiana* (trial testimony March 2016)

Jacobee Lee v Louisiana Board of Trustees for State Colleges, et al
*19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana* (deposition September 2015 and trial testimony March 2016)

Julie Unangst Quinn v Bobby Sperandeo, CPA and Malcolm M. Dienes, LLC
*24th Judicial District Court for the Parish of Jefferson* (deposition March 2016)

Michael Cheese v GIS Marine, LLC et al
*United States District Court for the Eastern District of Louisiana* (deposition April 2016)

Mr. J. Geoffrey Ormsby
January 23, 2019
Page 6

Lagniappe Logistics, Inc. of Mississippi v Scott Buras, Barrett McCreary, Todd
Nienaber, Citation Logistics, LLC, Citation Investments, Inc.
*22nd Judicial District Court for the Parish of St. Tammany* (deposition August 2016
and trial testimony October 2016)

Paul Thompson and David Simmons v Williams Companies, Inc., et al
*18th Judicial District Court for the Parish of Iberville* (trial testimony September
2016)

Phylway Construction, LLC v Terrebonne Parish Consolidated Government
*32nd Judicial District Court for the Parish of Terrebonne, State of Louisiana*
(deposition October 2016)

Mohab Said v Federated Rural Electric Insurance Exchange
*36th Judicial District Court for the Parish of Beauregard*, State of Louisiana
(deposition October 2016)

Paul Thompson and David Simmons v Williams Companies, Inc., et al
*18th Judicial District Court for the Parish of Iberville* (trial testimony November
2016)

Timothy L. Chandler v United States of America and Nathaniel B. Greene, Sr.
*United States District Court for the Western District of Louisiana* (deposition
February 2017)

Cody B. Teague, et al v. Baker Hughes Oilfield Operations, Inc., et al
*In the Circuit Court of Bibb County, AL – CV 2012-900011* (deposition March
2017)

Janet Krug and Michael Krug v Celebrity Cruises, Inc.
*United States District Court for the Southern District of Florida, Miami Division*
(deposition May 2017)

Shawn L. Saunders v Canal Insurance Company, et al
*19th Judicial District Court for the Parish of East Baton Rouge* (deposition October
2017)

First American Bankcard, Inc. v Smart Business Technology, Inc., et al
*United States District Court for the Eastern District of Louisiana* (deposition
October 2017)

Mr. J. Geoffrey Ormsby
January 23, 2019
Page 7

In the Matter of the Arbitration Between:  Sammye M. Brock and Estate of Dr. Don
J. Brock, Claimants, v Raymond James & Associates, Inc., Raymond James
Financial Inc., Frank Gibson, and Elizabeth Gibson, Respondents
*Finra Case No.:  16-02930* (testimony November 2017)

Leslie Bateman Brennan v Richard Joseph Brennan, Jr.
*Civil District Court for the Parish of Orleans* (deposition and trial testimony
February 2018)

Rebecca H. Holloway, et al v Dr. Glenn E. Hummel, et al
*4th Judicial District Court for the Parish of Ouachita, State of Louisiana* (deposition
April 2018)

Leigh Ann Schell and McGready L. Richeson v Kuchler, Polk, Schell, Weiner &
Richeson, LLC
*Civil District Court for the Parish of Orleans* (deposition May 2018)

The Finish Line, Inc. v Jayesh Patel; Pumilia & Adamec LLP f/k/a Pumilia Patel &
Adamec LLP, and Does 1 through 100, Inclusive
*Superior Court of the State of California for the County of Los Angeles* (deposition
May 2018)

Mathes Brierre Architects, APC v Karlton/ISG Enterprises, LLC, International
Sales Group, LLC and J.S. Karlton Company, Inc.
*Civil District Court for the Parish of Orleans, State of Louisiana* (trial testimony
May 2018)

Angela Morris, as Conservator for Kentheral Chambers, Jr, as incapacitated adult
v The Emory Clinic, Inc., Emory University, Jonathan Grossberg, M.D., Joshua
Osbun, M.D., Brandon Miller, M.D., John Doe M.D.'s 1-2 and XYZ Corporations
*In the State Court of DeKalb County, State of Georgia* (deposition June 2018)

JAI, LLC and Ashok D. Patel v Jaydel Sachania and Sonia Sachania
*9th Judicial District Court for the Parish of Rapides* (deposition June 2018)

Andre White, Claimant v Flowers Baking Co. of Houston, LLC, Respondent
*The Arbitration Tribunals of the American Arbitration Association* (deposition
September 2018)

Hunters Run Gun Club, LLC and The Great International Land Company, LLC v
Eddie D. Baker
*United States District Court for the Middle District of Louisiana* (deposition
September 2018)

Mr. J. Geoffrey Ormsby
January 23, 2019
Page 8

Coastal Industries, LLC v Arkel Constructors, LLC
*American Arbitration Association* (arbitration testimony September 2018)

J Ellsworth Corporation v American Casualty Company of Reading, PA
*United States District Court for the Eastern District of Louisiana* (deposition October 2018)

Justin P. Hughes v Skanska USA Building, Inc., et al
*Civil District Court for the Parish of Orleans, State of Louisiana* (deposition October 2018)

Jessie Lara-Brown, Claimant v Flowers Baking Co. of Houston, LLC, Respondent
*The Arbitration Tribunals of the American Arbitration Association* (arbitration testimony November 2018)

Jeffrey E. Meyers does hereby state the following:

In accordance with Rule 26 of the Federal Rules of Civil Procedure, I do hereby state the following:

I have not authored any publications within the preceding 10 years.

I am being compensated for my work according to my standard fee schedule, which is $315 per hour, with the exception of court time and depositions, for which my standard rate is $630 for the first hour and $315 for each additional hour.

I have testified as an expert at trial and/or been deposed within the preceding four years in the following matters:

Heather Roper Kaptein v Jesse Kaptein
*Civil District Court for the Parish of Orleans* (trial testimony March 2015)

Lagniappe Logistics, Inc. of Mississippi v Scott Buras, Barrett McCreary, Todd Nienaber, Citation Logistics, LLC, Citation Investments, Inc.
*22nd Judicial District Court for the Parish of St. Tammany* (deposition August 2016)

Douglas Delaney and Danielle Delaney v Morris Seantry and Ports America Louisiana, LLC
*Civil District Court for the Parish of Orleans* (trial testimony June 2017)

Mr. J. Geoffrey Ormsby
January 23, 2019
Page 9

Philip R. Adams v CoSolutions, Inc.
*United States District Court for the Eastern District of Louisiana* (deposition
November 2017)

John Murphy v Cheryl Griffin Murphy
*22nd Judicial District Court for the Parish of St. Tammany* (trial testimony
November 2017)

Eliana Amparo Soto v Alireza Sadeghi
*Civil District Court for the Parish of Orleans* (trial testimony December 2017)

Campano, et al v USA
*United States District Court, District of Hawaii* (Report Admitted as Trial
Testimony December 2017)

In Re:  Lowyless Glasper v Pennymac Holdings, LLC by Pennymac Loan
Servicing, LLC Its' Servicing Agent
*United States Bankruptcy Court, Eastern District of Louisiana* (deposition March
2018)

Paradigm Health System, LLC v Barry Faust
*22nd Judicial District Court for the Parish of St. Tammany* (deposition March 2018)

The Finish Line, Inc. v Jayesh Patel; Pumilia & Adamex LLP f/k/a Pumilia Patel
& Adamec LLP, and Does 1 through 100, Inclusive
*Superior Court of the State of California for the County of Los Angeles* (deposition
April 2018)

Lynda Ronquillo Ton v Hendrikus Ton
*25th Judicial District Court for the Parish of Plaquemines* (trial testimony May
2018)

Parastoo Rezaeimehr v Nasser Pazooki
*24th Judicial District Court for the Parish of Jefferson* (deposition August 2018)

Michael A. Munnings v Terry Burr, et al
*United States District Court for the Middle District of Louisiana* (deposition
August 2018)

Aylin Maklansky v Steven Maklansky
*Civil District Court for the Parish of Orleans* (trial testimony September 2018)

Mr. J. Geoffrey Ormsby
January 23, 2019
Page 10

In the Matter of:  Juli Juneau v Stewart J. Juneau
*Civil District Court for the Parish of Orleans* (depositions December 2017 and September 2018)

Robert Emery Meachem v Andrea Rhodes Meachem
*24nd Judicial District Court for the Parish of Jefferson* (deposition August 2016 and trial testimony September 2016 and October 2018)

We attach the following:

1.   Exhibit 1 – Shane Macy – *Summary of Loss*

2.   Our Curricula Vitae


_____                    _____
Harold A. Asher                                         Date   1/23/19


_____                    _____
Jeffrey E. Meyers                                      Date   1/23/19

# SHANE MACY

## *SUMMARY OF LOSS*

| | | | |
|---|---|---|---|
| A | PAST LOSS [1] | $ | 154,424 |
| B | FUTURE LOSS | | 444,800 |
| C | FUTURE MEDICAL COSTS | | 340,343 |
| D | TOTAL LOSS | $ | 939,567 |

*(1) - FROM THE DATE OF THE ACCIDENT THROUGH MAY 20, 2019 (DATE OF TRIAL)*

**EXHIBIT 1**

# *Harold A. Asher, CPA, ABV, CFF, CVA, CFE, FCPA*

## Professional & Business History

Asher Meyers, L.L.C., Co-Founder July 2016 to present
Harold A. Asher, CPA, L.L.C., January 2002 to present
Katz & Asher, Ltd. A Corporation of Certified Public Accountants and Consultants
    Co-founder and Partner (October 1979 to December 2001)
K & A Capital Management, Owned and managed a Registered Investment Advisory Firm
    (1999 to 2001)
Koltun & Buckman, Ltd. (1978 to1979)
Price Waterhouse & Co. (1975 to1978)
Mr. Asher has provided investment advice to clients since 1979.

## Education

Masters of Business Administration, Tulane University (May 1975) with concentration in
    Accounting and Finance
Bachelor of Science with Major in Biology, Tulane University (May 1973)
Professional Education includes at least 40 annual hours.

## Range of Experience

Mr. Asher has experience in compilations, reviews and audits of financial statements; individual, corporate, fiduciary, partnership and estate tax planning and compliance; financial and pension consulting and planning; forensic accounting, fraud investigation, investment advisory services, litigation support and business valuation services.

His financial consulting experience consists of analysis of proposed investment vehicles (including, but not limited to, marketable and closely-held stocks, tax favored investment strategies, bonds and limited partnerships) and assistance in developing a suitable portfolio, which meets the client's specific objectives for liquidity, diversification, risk and return. He has designed and reviewed internal accounting control systems. This work defined weaknesses and implemented recommendations to correct them.

He is experienced in pension consulting and compliance that includes analysis of client retirement objectives, investment criteria and determination of cost of funding the non-owner employee benefit. He has performed administrative services including preparation of Form 5500C/R (Return/Report of Employee Benefit Plan), participants' statements, summary annual reports, balance sheets and statements of income and expenses.

Mr. Asher's extensive litigation support and business valuation services include examination and analysis of data, calculations and formulation of projections, assistance in discovery process, negotiations, depositions and trial testimony.

# *Harold A. Asher, CPA, ABV, CFF, CVA, CFE, FCPA*

His widespread experience in various areas includes, but is not limited to, valuation of medical and legal entities, valuation of commercial business entities, valuation of ownership interest in real estate limited partnerships, valuation of family limited partnerships, valuation of limited liability companies, valuation of participant interest in pension plans, calculation of income for child support purposes, calculation of damages resulting from securities transactions, asset allocation and suitability determination in securities litigation, accounting malpractice claims, calculation of damages resulting from personal injuries, calculation of lost profits, calculation of present value of projected future medical costs, calculation of damages in commercial matters, calculation of damages in construction related matters, calculation of losses relating to business interruption matters, fraud investigation and forensic accounting.

## Qualifications

Mr. Asher is qualified as an expert witness in the United States District Court, Eastern and Western Districts of Louisiana, Southern District of Alabama, Western District of Michigan Southern Division and District of New Mexico, the United States Bankruptcy Court, Eastern and Middle Districts of Louisiana, Middle District of Tennessee and Southern District of Texas, Corpus Christi Division, the 1st Judicial District Court for the Parish of Caddo, the 24th Judicial District Court for the Parish of Jefferson, the Civil District Court for the Parish of Orleans, the 22nd Judicial District Court for the Parish of St. Tammany, the 19th Judicial District Court for the Parish of East Baton Rouge, the 29th Judicial District Court for the Parish of St. Charles, the 18th Judicial District Court for the Parish of Iberville, the 34th Judicial District Court for the Parish of St. Bernard, the 23rd Judicial District Court for the Parish of St. James, the 15th Judicial District Court for the Parish of Lafayette, the 4th Judicial District Court for the Parish of Ouachita, 143rd Judicial District Court of Ward County, Texas, Court of Common Pleas Hamilton County, Ohio and Circuit Court of Jackson County, Mississippi.  In addition, he is qualified in various National Association of Securities Dealers (NASD) proceedings and various American Arbitration Association (AAA) proceedings.

He has been selected by the United States Department of Justice to calculate damages in civil and criminal Matters.

He served as Financial Advisor for both Louisiana Stadium and Exposition District and New Orleans Convention and Visitors Bureau.

Mr. Asher has also served as financial consultant in connection with the relocation of the Charlotte Hornets of the National Basketball Association to New Orleans.

## Personal

Mr. Asher received his Certified Public Accountant certification in July 1976.  He is a member of the American Institute of Certified Public Accountants, its Business Valuation and Forensic & Litigation Services Section and the Louisiana Society of Certified Public Accountants.

2

## *Harold A. Asher, CPA, ABV, CFF, CVA, CFE, FCPA*

The American Institute of Certified Public Accountants designated Mr. Asher as Accredited in Business Valuation in February 2007 and as Certified in Financial Forensics in July 2008.

He was designated a Certified Fraud Examiner by the Association of Certified Fraud Examiners in February 1995 and a Certified Valuation Analyst by the National Association of Certified Valuators and Analysts in December 1995.

Mr. Asher is a member of the Securities Experts Roundtable.  He received his Series 65 License from the Securities and Exchange Commission in December 1999 and served as a registered investment adviser from 1999 through 2004.

He was designated as a Forensic Certified Public Accountant in March 2006.

Mr. Asher is a member of the National Association of Forensic Economists, American Academy of Economic and Financial Experts and Institute of Business Appraisers.

He served on the Board of Tour de Lis, a cancer support organization.

Mr. Asher was President of the Jewish Federation of Greater New Orleans (1999 through September 2001) and President of the Louisiana Council of American Israeli Public Affairs Committee (AIPAC) from June 2003 to June 2005.

**Contact Information**

Harold A. Asher                              Office:  504.566.7577
433 Metairie Road, Suite 215                 Direct Dial:  504.308.3515
Metairie, Louisiana 70005                    Fax:  504.566.9003
E-Mail:  hasher@asher-meyers.com

# *Jeffrey E. Meyers, CVA, MAFF, CFE*

**Professional & Business History**

Asher Meyers, L.L.C., Co-Founder July 1, 2016 to present
Harold A. Asher, CPA, L.L.C., January 2005 through June 30, 2016
Loyola University of New Orleans, August 2004 to present
University of New Orleans, August 2003 through December 2004
Louisiana Department of Insurance, September 2001 through July 2003

**Education**

Masters of Science in Mathematics, University of New Orleans, December 2004
Concentration in Statistics

Bachelor of Science with major in Mathematics, Louisiana State University, July 2003
Magna Cum Laude, LSU Honors College, Sophomore Honors Distinction

**Range of Experience**

Mr. Meyers' litigation support and business valuation services include examination and analysis of data, calculations and formulation of projections, and assistance in the discovery, negotiation, deposition and trial processes.

Mr. Meyers' has extensive consulting and business valuation experience in various areas, including but not limited to, valuation of commercial business entities, valuation of ownership interest in real estate limited partnerships, valuation of limited liability companies, calculation of income for child support purposes, calculation of damages resulting from securities transactions, asset allocation and suitability determination in securities litigation, calculation of damages resulting from personal injuries, calculation of lost profits, calculation of present value of projected future medical costs, calculation of damages in commercial matters, calculation of damages in construction related matters, calculation of losses relating to business interruption matters, fraud investigation and forensic accounting.

Mr. Meyers' experience includes the application of various statistical concepts including, but not limited to, data analysis, statistical graphs, sampling, regression analysis, data production, probability theory and statistical testing and inference.

**Qualifications**

Mr. Meyers is qualified as an expert witness in the 24th Judicial District Court for the Parish of Jefferson, Civil District Court for the Parish of Orleans, 22nd Judicial District Court for the Parish of St. Tammany, 25th Judicial District Court for the Parish of Plaquemines, United States District Court for the District of Hawaii and in FINRA Arbitration proceedings.

## *Jeffrey E. Meyers, CVA, MAFF, CFE*

**Personal**

Mr. Meyers was designated a Certified Valuation Analyst by the National Association of Certified Valuators and Analysts in May 2009 and a Master Analyst in Financial Forensics co-sponsored by the National Association of Certified Valuators and Analysts as of July 2010.

The Association of Certified Fraud Examiners designated Mr. Meyers a Certified Fraud Examiner in February 2011.

Mr. Meyers is a member of the National Association of Certified Valuators and Analysts, Association of Certified Fraud Examiners and the American Statistical Association.

Mr. Meyers has been an adjunct professor of mathematics (algebra, finite mathematics and statistics) at Loyola University since 2006.

He was previously elected and served on the Litigation Forensics Board for the National Association of Certified Valuators and Analysts.

He also served on the Editorial Board of the National Litigation Consultants' Review and the Board of Tour de Lis, Inc., a cancer support organization.

**Contact Information**

Jeffrey E. Meyers  
433 Metairie Road, Suite 215  
Metairie, Louisiana 70005

Phone:  (504) 566-7577  
Fax:  (504) 566-9003  
E-mail:  jmeyers@asher-meyers.com

## Joseph R. Bridges
### *Maritime Solutions and Consulting*
1210 Baronne St New Orleans, LA
504 579-9418    jrbridges21@gmail.com

**Preliminary Report**
22 January 2019
**Shane Macy versus HINODE KAIUN CO., LTD,**
**in personam, M/V NICHIRIN, in rem**
**Civil Action NO. 18-04415**
**JUDGE Lance M. AFRICK**

Attention:        J. Geoffrey Ormsby and Dylan Leach of Smith & Fawer, L.L.C

**The following documents were reviewed to form an opinion regarding Shane Macy versus HINODE KAIUN Co., Ltd, in personam, M/V Nichirin, in rem.**

1. Cooper T Smith, Supervisor's Investigation Report of Employee Accident/Illness, Shane Macy, dated the 21st of December 2015.
2. Complaint, Shane Macy versus HINODE KAIUN Co., Ltd, in personam, M/V Nichirin, in rem, dated the 30th of April 2018.
3. Answer of Hinode Kaiun Co., Ltd, Shane Macy versus HINODE KAIUN Co., Ltd, in personam, M/V Nichirin, in rem, dated the 19th of October 2018.
4. Defendant's Status Report dated the 21st of December 2018.
5. Plaintiff's Status Report dated the 21st of December 2018.
6. Disclosures of Hinode Kaiun Co., Ltd, dated the 28th of November 2018.
7. Shane Macy deposition transcript and exhibits dated the 8th of January 2019.
8. M/V Nichirin deck log for the 16th of December 2015.
9. Agri Port Services (APS), Port Log & Statement of Facts, M/V Nichirin, 10th of December thru the 19th of December 2015.
10. M/V Nichirin Ship's Particulars.
11. M/V Nichirin Crew Onboard Report dated the 14th of December 2015.
12. Shane Macy, Cooper/T. Smith Employment File Parts 1 & 2

*Common Terms*
Many nautical terms are used interchangeably and understood despite the fact they have different descriptions.

Heaving Line                 A light flexible line that can be thrown.   It is used as a messenger to pass heavier lines from vessel to shore, or vice versa and vessel to vessel.  **Shane Macy refers to the heaving line in his deposition transcript as the (messenger line).**



THROWING A HEAVING LINE



Bollards                          Marine bollards are the anchor point for mooring lines to be fixed ashore in order to safely secure vessels alongside jetties/quay, berths, wharves and dolphins in ports and harbors. (See Figure1)



Figure 1

Bitts                             Marine bitts are on the vessel and are the anchor point for loose mooring lines to be made fast that are not secured to a mooring drum.  (See Figures 2 & 3)




Figure 2 (Bitt)                              Figure 3 (Mooring Drum & Warping Head)

Messenger Line                   A light line attached to the end of a mooring line and used to assist in heaving the mooring line to the shore or to another vessel.  A messenger line is a short line attached to the eye of a mooring line. **In the deposition transcript of Shane Macy, the messenger line was referred to as a whip and the heaving line was made fast to the eyes on the bitter end of the messenger lines (whips).**[1] (See Figure 4)

---

[1] Deposition transcript, Shane Macy, Exhibit 3, Pages 60, 63, 68, 74, 76, 77, 78, 79, 81, 82, 86, 90, 91, 92, 93, 94, 96, 99, 113,

2



Figure 4
(Messenger Lines attached to the eyes of mooring lines made fast to a Bollard)

Bight of the Line          A bight is a curved section or slack part between the two ends of a line. "Any section of line that is bent into a U-shape is a bight." (See Figure 5 & 6)





Figure 5                              Figure 6

Quick Release Knots/Hitches          The Sheet Bend, Bowline and Clove Hitch are three main knots which can be released quickly by using a bight instead of an end in the last phase of tying them. Such knots will hold a steady strain.  (See Figure 7)



(i) Slip sheet bend      (ii) Slip bowline     (iii) Slip clove hitch
Figure 7

3

*Overview*

The M/V Nichirin arrived at SW Pass on the 10th of December 2015, tendered Notice of Readiness on the 11th of December 2015, and was all fast at ADM Destrehan at 1430 hours on the 16th of December 2015.  Cooper/T. Smith Mooring  provided 2 Line Handlers aft and 2 Line Handlers forward on the ADM Destrehan dock with Robert Helmstetter and Shane Macy taking the forward mooring lines from the M/V Nichirin.  The two spring lines were the first mooring lines to go out forward.  The forward heaving line from the M/V Nichirin was passed ashore to Shane Macy and Robert Helmstetter.  Prior to the forward deck crew passing the heaving line ashore, a bight of the heaving line was made fast to the eyes on the bitter ends on the messenger lines (whips) that were attached to the eyes of the two spring lines.[2]  The eyes of the two spring lines were hauled up to the dock approximately 12 ft upriver from the bollard on the dock.[3]  Robert Helmstetter was approximately 4 ft upriver on the dock from Shane Macy and approximately 15-16 ft from the bollard.[4]  The deck crew of the M/V Nichirin had not provided enough slack and as the M/V Nichirin was continuing to move upriver along the dock, Robert Helmstetter was struggling with the spring line he was handling.  There was more slack in the spring line that Shane Macy was handling and as he approached the bollard to place the eye of the mooring line over the bollard he was prevented from completing the maneuver because the heaving line had been made fast to the ships' railing by the forward deck crew of the M/V Nichirin.[5]  Shane Macy stated that the heaving line had been made fast to the ship's railing with a quick release hitch.[6]  Shane Macy cut the two messenger lines (whips) that were attached to the eyes of the two spring lines, relieving the pressure from the heaving line that was made fast to the railing.  After cutting the messenger lines (whips), Shane Macy was able to place the eye of the spring line that he was handling onto the bollard.  The forward deck crew eventually provided slack and Shane Macy assisted Robert Helmstetter in placing the spring line he was handling onto the Bollard.[7]  The remainder of forward breastlines and headlines were placed on bollards without incident.  **It was the responsibility of the forward deck crew of the M/V Nichirin to provide appropriate slack in the spring lines as they were being passed ashore as well as slack in the heaving line.**  There was approximately 15-20 feet distance from the water to the top of the dock and the mooring lines were heavy with water from the river.[8] It requires great effort to pull the heavy mooring lines up from the water and throw the mooring line eye over the bollard.  The taut heaving line that was tied off to the ships' railing on the M/V Nichirin prevented Shane Macy from completing his attempt to place the eye of the mooring line over the bollard.[9]  Shane Macy's shoulders and neck were severely injured as a result of attempting to place the eye of the forward spring line of the M/V NICHIRIN onto the bollard, and requiring cervical disc replacement.[10]

Shane Macy testified that he knew as soon as the adrenaline went away that there was something wrong with his neck and as he cooled down pain developed within minutes.[11]  As soon as the mooring lines were made fast the job was called into the office and Shane Macy advised his supervisor Anthony Almerico that he had been injured.[12]

---

[2] Deposition transcript, Shane Macy, Exhibit 3, Page 63
[3] Deposition transcript, Shane Macy, Pages 63-64
[4] Deposition transcript, Shane Macy, Page 64
[5] Deposition transcript, Shane Macy, page 67
[6] Verbal conversation with Shane Macy the 17th of January 2019
[7] Deposition transcript, Shane Macy, Pages 68-69
[8] Deposition transcript, Shane Macy, Page 67
[9] Deposition transcript, Shane Macy, Pages 73-74
[10] Plaintiff's status report
[11] Deposition transcript, Shane Macy, Page 95
[12] Deposition transcript, Shane Macy, Page 98

After leaving ADM Destrehan, Shane Macy and Robert Helmstetter drove to Kenner at the request of Cooper/T. Smith Mooring, where Shane Macy provided a Urine Sample.[13] After providing the Urine Sample Shane Macy testified that he started taking Ibuprofen because he was experiencing pain in his neck and arm.[14] Later that day Shame Macy participated in another line handling job at the BP Dock and had to rely on the other line men because he was experiencing a lot of pain in his neck and right arm.  That was the last line handling job that Shane Macy performed for Cooper/T. Smith Mooring and he was placed on light duty for the next 6 months.[15]

M/V Nichirin

| | | | | | |
|---|---|---|---|---|---|
| Port of Registry | Panama | IMO Number | 9478913 | Supramax Bulk Carrier | |
| LOA | 189.99 M | LBP | 182 M | Breadth | 32.26 M |
| Depth Molded | 17.90 M | Summer Draft | 12.573 M | Deadweight Tonnage | 55,694 MT |
| Gross Tonnage | 31,228 | Net Tonnage | 18,516 | Lightship | 8,873 MT |
| Displacement | 64,567 MT | Speed | 14.25 Knots/Ballast 14.0 Knots/Loaded | | |
| Consumption | 31.5 MT/DY | Main Engine | DE Mitsui MAN B&W 6S50MCC | | |
| Builder | Mitsui Engineering and Shipbuilding | | | | |
| Place Built | Tamano, Japan | | | | |
| Year Built | 2010 | | | | |
| Owners | Hinode Kaiun Co., Ltd., Mansei Kaiun Co., Ltd and Sunmarine Maritime S.A. | | | | |
| Charterers | Mitsui O.S.K. Lines, Ltd. | | | | |
| Operators/Managers | New Century Overseas Management, Inc.[16] | | | | |

The M/V Nichirin is currently trading as SSI Majestic.



M/V Nichirin

---

[13] Deposition transcript, Shane Macy, Page 101
[14] Deposition transcript, Shane Macy, Pages 101-102
[15] Deposition transcript, Shane Macy, Pages 103-104 & 115
[16] M/V Nichirin Ship's Particulars

ADM Destrehan

Located at Mile Marker 120.6 AHP (Ahead of Passes) on the left descending bank of the Mississippi River.  ADM Destrehan is part of the Archer Daniels Midland group.  ADM Destrehan handles Grain & By-products  with 7 Loading Spouts and has 5,500,000 Bushel Capacity.[17] (See Figures 8, 9 & 10)




Figure 8                                   Figure 9



Figure 10

_____

[17] http://www.bluewatershipping.com/locationdetails.php?Id=9

6

Cooper/T. Smith Mooring

Part of the Cooper Group of Companies.  "At the Port of New Orleans, Cooper/T. Smith Mooring (CTS Mooring) provides complete, professional mooring services. These services are available at all terminals, city-front docks and midstream facilities, from the mouth of the Mississippi River to Baton Rouge. Operations and personnel are coordinated by our dispatchers 24 hours per day, 365 days per year. CTS Mooring operates a large fleet of launch boats and vans, all dispatched from our central office at Algiers Point. Cooper/T. Smith Mooring (CTS Mooring) formed in January 1959 as a means to complement Crescent Towing's tug services. Since 1959, CTS Mooring has grown from a small operation with only four employees, to an extensive company of over 100 employees.  CTS Mooring has the largest footprint of mooring services on the Mississippi River, providing mooring services from the mouth of the Mississippi River, around mile 10, to Baton Rouge, LA, mile 230. Mooring operations run 365 days a year with approximately 30 line-handler employees working around the clock."[18] (See Figures 11 & 12)



Figure 11



Figure 12

*Summary and Conclusions*

Working on the waterfront as a line handler can be a dangerous occupation.  Each dock and or midstream buoy operation on the Mississippi River presents a different set of challenges.  Having to walk heavy mooring lines along the edge of a dock requires concentration and an appreciation for safety precautions.

Typically, the responsible person for the dock advises what position or berth alongside the dock the vessel should be moored.  This information is passed to the line handlers and Pilot who advises the Bridge Navigation Team.  The deck officers forward and aft must assess the dock and location of bollards while approaching the berth to ensure that the ship can be safely moored.  The deck officers forward and aft must communicate with the line handlers ashore to effect safe operations as well as pass relative information to the Bridge Navigation Team.  **The forward deck crew of the M/V Nichirin were not properly trained or staffed and did not possess the necessary competencies required to safely moor the vessel to the berth at ADM Destrehan on the 16th of December 2015.**  The Chief Officer and two Ordinary Seaman who were forward on the M/V Nichirin did not provide enough slack to the spring line that Robert Helmstetter was handling or to the heaving line which they had made fast to the ship's rail.   Shane Macy was injured when he met resistance from the heaving line that had been made fast to the ship's rail while attempting to place the eye of the spring line he was handling onto the bollard.

---

[18] https://www.coopertsmith.com/Operations/CTS-Mooring

According to the M/V Nichirin Crew Onboard Report (Crew List), the unlicensed deck department consisted of one Bosun, two Able Seaman (AB), two Ordinary Seaman (OS) and one Deck Cadet. The Disclosures of Hinode Kaiun, Co, Ltd indicates that the following crew members from the deck department might have discoverable information:

| | |
|---|---|
| Chief Officer | June Martin M. Gill |
| OS | Erickson Y. Amolo |
| OS | Rene F. Beciete |

This would indicate that when the M/V Nichirin berthed at ADM Destrehan on the 16th of December 2015, the deck crew on the forward end of the ship consisted of the Chief Officer and two Ordinary Seaman. This is not consistent with Industry best practice and the practice of good seamanship. While coming alongside the berth, one AB would be required to be at the wheel as part of the Bridge Navigation Team. The deck crew on the forward end would be responsible for operating the mooring machinery, handling the mooring lines and stoppers, as well as responsibility for the anchor/anchor windlass in an emergency. Additionally, the Chief Officer must provide essential information such as distance to the dock etc., to the Bridge Navigation Team. **This could not be safely accomplished with only 2 Ordinary Seamen.** Industry best practice would have the Chief Mate and Bosun on the forward end when the vessel is berthing or in congested waters. **With only five members in the unlicensed deck department the M/V Nichirin was operating at the minimum standard.** Not all mooring lines come from mooring drums and require tightening the mooring line on a warping head, stopping off the mooring lines and securing the mooring lines onto the bitts. The forward deck crew was not providing enough slack to the spring line that Robert Helmstetter was handling and had secured the heaving line to the ships' rail, which created a dangerous environment for the line handlers ashore. With only 3 deck personnel forward the Chief Officer would be required to assist the Ordinary Seamen in operating the mooring machinery and handling the mooring lines which would conflict with his responsibility to supervise mooring operations and provide essential information to the Bridge Navigation Team. Ordinary Seaman do not have the experience of the Bosun or an Able Seamen. **The Master of the M/V Nichirin failed to properly train and or man his ship during critical berthing operations at ADM Destrehan on the 16th of December 2015.** It is my opinion, based on the minimal manning onboard the M/V Nichirin, that the Master should have utilized the Deck Cadet and members of the unlicensed engine department to supplement the limited number of deck department personnel during critical berthing operations. Industry best practice and good seamanship would dictate the following arrangement based on the M/V Nichirin's manning, during berthing operations:

| Forward End | Aft End |
|---|---|
| Chief Officer | 2nd Officer or 3rd Officer |
| Bosun | Able Seaman |
| Ordinary Seaman | Ordinary Seaman |
| (Deck Cadet/Unlicensed Engine Dept. Personnel) | (Unlicensed Engine Dept. Personnel) |

When the M/V Nichirin berthed at ADM Destrehan on the 16th of December 2015, the forward deck crew secured a bight of the heaving line to the eyes of the messenger lines that were attached to the eyes of the two spring lines. Additionally, the forward deck crew secured another bight of the heaving line to the ships' rail forward, which restricted the ability to provide slack to the heaving line as necessary. Securing a bight of the heaving line to the messenger lines and another bight of the heaving line to the ships' rail allowed for the bitter end of the heaving line to be retained onboard, but clearly created problems for the forward deck crew and line handlers ashore. Securing the bight of the heaving line to the ship's rail prevented the heaving line from paying out freely, resulting in a dangerous situation for the line handlers and an injury to Shane Macy.

8

It is my experience that employing multiple heaving lines forward and aft during berthing operations provides flexibility and added safety. The bitter end of the heaving line can be made fast directly to the eye of the mooring line or to the messenger line made up to the eye of the mooring line.  It is not necessary to retain the bitter end of the heaving line onboard during berthing operations unless there are not enough heaving lines onboard to accomplish the berthing operation efficiently and safely.

### Opinions

1. The Master of the M/V Nichirin failed to properly train and or man his ship during critical berthing operations at ADM Destrehan on the 16th of December 2015.
2. The forward deck crew of the M/V Nichirin were not properly trained or staffed and did not possess the necessary competencies required to safely moor the M/V Nichirin to the berth at ADM Destrehan on the 16th of December 2015.
3. It was the responsibility of the forward deck crew of the M/V Nichirin to provide appropriate slack in the spring lines as they were being passed ashore as well as slack in the heaving line.
4. On the 16th of December 2015, the forward deck crew of the M/V Nichirin failed to provide appropriate slack to the spring lines as they were being passed ashore.
5. On the 16th of December 2015, the forward deck crew of the M/V Nichirin failed to provide appropriate slack to the heaving line they had secured to the ship's rail.
6. With only five members in the unlicensed deck department the M/V Nichirin was operating at the minimum standard.
7. The deck crew on the forward end would be responsible for operating the mooring machinery, handling the mooring lines and stoppers, as well as responsibility for the anchor/anchor windlass in an emergency. Additionally, the Chief Officer must provide essential information such as distance to the dock etc., to the Bridge Navigation Team.  This could not be safely accomplished with only 2 Ordinary Seamen.
8. With only 3 deck personnel forward the Chief Officer would be required to assist the Ordinary Seamen in operating the mooring machinery and handling the mooring lines which would conflict with his responsibility to supervise mooring operations and provide essential information to the Bridge Navigation Team.
9. The Bosun or an Able Seaman should have been forward during berthing operations.
10. The Master should have utilized members of the unlicensed Engine Department to assist the deck crews fore and aft during berthing operations.
11. Shane Macy was injured when he met resistance from the heaving line that had been made fast to the ship's rail while attempting to place the eye of the spring line he was handling onto the bollard.
12. Shane Macy's injuries sustained on the 16th of December 2015, were the direct result of the actions of the M/V Nichirin, her Owners, Master and Crew.

This report is based on the documents and information listed herein.  I reserve the right to modify and or supplement this report should additional information and or evidence become available.

Respectfully,

Captain Joseph R. Bridges

9

**Captain Joseph R. Bridges**

Captain Bridges is a 45-year veteran of the maritime industry, having sailed in various positions from Graduate Trainee to Ship's Master.  Upon returning from Europe, he was a Senior Vice President with a leading Port Agency business with responsibly for all activity involving their customer's vessels and cargo in the Gulf of Mexico with 4 offices.  His experience includes running 2 London based shipping companies as the Chief Operating Officer with full P&L responsibility; and tasked with the day to day running of the business, including all commercial and technical activities as well as placing marine insurances and claims mitigation for the fleet of 50 plus ships.  Captain Bridges has also been responsible for all chartering and fuel procurement activities for a major liner company and ran 2 Regional Offices for major liner companies with responsibility for all sales, logistics, customer service, marine and terminal operations. Captain Bridges has been involved in ship management, providing guidance to the office, fleet and mariners for most of his shore side career and has testified in Federal Court and Depositions for Maritime Litigation Cases as an Expert.  Captain Bridges started his shore side career as Head Port Captain with Lykes Bros Steamship Company in New Orleans, LA.

**Joseph R. Bridges**
***Maritime Solutions and Consulting***
1210 Baronne St. New Orleans, LA 70113
504 579-9418     jrbridges21@gmail.com

**Fee Schedule**

Fees for expert witness consulting that require travel and extended stays will be billed at $1,000 per day.

Fees for expert witness consulting is hourly at a rate of $200 per hour for all time spent on the case including but not limited to:

- Standard Review
- Deposition Review
- Discussions with counsel, witnesses and others
- Research
- Preparation of opinion and rebuttal
- Preparation for deposition
- Preparation for court appearance
- Travel time outside of New Orleans, LA
- Expenses for meals, lodging, transportation etc. are billed at actual cost
- Mileage is billed at the current IRS rate
- Completed work will be billed periodically
- Require a retainer of 10 hours that will be credited to the final bill

Fees for Depositions and Court Appearances will be billed at $300 per hour.

Payment is due 30 days after presentation of invoice.

11

**Joseph R. Bridges**
***Maritime Solutions and Consulting***
1210 Baronne St., New Orleans, LA
504 579-9418      jrbridges21@gmail.com

## CASES WHERE DEPOSED OR TESTIFIED

St. James Stevedoring Partners, LLC vs Motion Navigation, Ltd. Civil Action No. 13-00541

- Deposed 17 January 2014
- Testified 6 February 2014
- Preliminary Report December 2013
- Attorneys James Bercaw and Ben Gonsoulin with King, Krebs & Jurgens, PLLC

Eliezer Cruz-Aponte, et al., Plaintiffs, vs. Caribbean Petroleum Corp., et al.,

- Deposed 20 October 2015
- Preliminary Report 9 September 2015
- Supplemental Report 18 November 2018
- Attorney Camilo Salas, Salas Law

J.D. Fields & Company vs North American Fabricators, LLC

- Testified 8 September 2016
- Preliminary Report 28 March 2016
- Freight Calculation 3 April 2016
- Attorneys Bob McClesky and Marc Mathews with Phelps Dunbar LLP

Privocean Limitation of Liability

- Testified 24 April 2018
- Preliminary Report 1 April 2017
- Supplemental Report 30 November 2017
- Attorneys Jeff Tillery, Barrett Rice, Katie Darden and Ford Wogan with Jones Walker LLP

## ADDITIONAL CASES WHERE EXPERT WITNESS REPORTS WERE EXECUTED

Musco and Cornish vs Weber Marine

- Preliminary Report February 2014
- Attorneys Craig Brewer and Tony Staines with Staines and Eppling, PLC

Alleged Accident of Kim A. Chiasson, Jr. and St. James Stevedoring

- Preliminary Report February 2014
- Attorney James Bercaw with King, Krebs & Jurgens, PLLC

12

**Joseph R. Bridges**

*Maritime Solutions and Consulting*

1210 Baronne St., New Orleans, LA 70113

504 579-9418    jrbridges21@gmail.com

Continued

Spartan Offshore Drilling, LLC vs Kevin Gros Offshore, LLC and Rockin "D" Marine Services, LLC

- Scheduled Deposition 5 March 2015 cancelled
- Preliminary Report 21 December 2014
- Attorney Allan Crane with The Miller Law Firm, PLLC

In the Matter of the Complaint of Lady Marie, LLC as Owner and Iberia Marine Service, LLC as Owner PRO HAC VICE, of M/V Lady Marie, her Engines, Tackle, Appurtenances, Furniture, etc., Praying for Exoneration from or Limitation of Liability

- Preliminary Report February 2015
- Attorney Stephen Hanemann and Zoe Vermeulen with Kean Miller, LLP

Fieldwood Energy LLC vs Diamond Services Corporation

- Preliminary Report 2 April 2015
- Attorney James Bercaw with King, Krebs & Jurgens, PLLC

Privocean examination of lines, line splicing and destructive testing for 3 D Marine

- 28 November 2015 to 28 January 2016 & 31 March to 20 April 2016
- Attorneys Barrett Rice and Ford Wogan with Jones, Walker, LLP

M/V Sunrise, port anchor break, White Castle Anchorage, Mississippi River

- 16 thru 20 March 2016
- Preliminary Report 29 March 2016
- Attorney John Fay with Fay Nelson Fay LLC

M/V Proteas collision with M/V Kambanos, Lower Mississippi River

- 25 May thru 27 July 2016
- Preliminary Report 20 July 2016
- Attorney John Fay with Fay Nelson Fay LLC

Josuel Valdez vs Alliance Offshore, LLC, et al, Civil Action No. 2:14-cv-00444

- 2-7 July 2016
- Preliminary Report 7 July 2016
- Attorney P. Wayne Pickering with Disiere, Jefferson & Wisdom, LLP

Nayana Parekh, Individually and as Personal Representative of Ambarish Parekh versus M/V African Raptor, in rem

- 6 January 2017 thru February 2018
- Preliminary Report 9 November 2017
- Attorneys Robert Barbier and Meredith Wilson-Blanque with Phelps Dunbar

**Joseph R. Bridges**

***Maritime Solutions and Consulting***

1210 Baronne St., New Orleans, LA 70113

504 579-9418      jrbridges21@gmail.com

Continued

Heath Colletti versus M/V Mr. Landon and Premier Tugs

- 16 December 2016 continuing
- Jodi Aamodt with Jacobs, Manuel, Kain & Aamodt, Co-Council Paul Sterbcow with Lewis, Kulman, Sterbcow & Abramson

M/T ICDAS 09 and Bryggen Shipping International vs Cornerstone Chemical Company

- 9 January 2017 thru 7 July 2017
- Robert Stefani with King Krebs & Jurgens, PLLC

Michael McDonald vs Central Boat Rentals, Inc.

- January 2017 thru February 2018
- Preliminary Report 30 January 2018
- Tony Morrow Law

New Belgium Brewing Company, Inc. versus Ziemann Holvrieka GmbH d/b/a Ziemann International GmbH

- 2 May 2017 continuing
- Preliminary Report 28 June 2018
- Adrian (Jay) Leonard IV and Christian Hendrickson with Sherman and Howard L.L.C.

Laurence P. Favalora vs Kevin Jennings, Matt Wall and State Farm Fire and Casualty

- 5 December 2017 thru 1 March 2018
- Preliminary Report 25 January 2018
- Adam Massey and Matthew Fraser with King and Jurgens LLC

BP Settlement Agreement  Claim ID No. 166951 Home Port

- 26 February thru 5 July 2018
- Preliminary Report 5 July 2018
- Craig Stokley with Palter Stokley Sims PLLC

In the matter of the complaint of Weeks Marine, Inc., as owner and operator of the 14097, for Exoneration from or Limitation of Liability

- 4 January thru 31 March 2018
- Preliminary Report 7 March 2018
- Paul Hesse with Brice Jones and Associates

IN THE MATTER OF THE COMPLAINT OF Rodi Marine, LLC, as Owner and Operator of the MV Wildcat, for Exoneration from or Limitation of Liability, USDC, EDLA, C.A. No. 17-05394, Sec. "E"(5)

- 24 October thru 23 November 2018
- Preliminary Report 23 November 2018
- James Bercaw with King and Jurgens LLC

14



Todd S. Capielano, M.Ed., LRC, CRC, LPC, CLCP, CCM
tcapielano@stokes-associates.com
504.454.5009
Direct Dial: 504.608.6957
Cell: 504.388.6910

February 21, 2019

Geoffrey Ormsby
Smith & Fawer
201 St. Charles Avenue
New Orleans, LA 70170-3702

RE:  Shane Macy
File Number:  TC18596

Dear Mr. Ormsby:

Updated research was conducted regarding earnings for *boat operators* employed at Cooper T. Smith.  This was the likely career path of Mr. Macy at the time of his injury. Mr. Macy was in the process of being trained for this position and would have likely become a *boat operator* within six to 12 months from the time of his injury.

Updated information regarding *boat operators* was obtained from Mr. Paul Lagarde (former employee and boat operator at Cooper T. Smith). This research indicated that earnings for boat operators who have had five to ten years of service with the company had a wage of $18.10 per hour.  It was also confirmed by Mr. Lagarde that the employer guaranteed 72 hours per week with the opportunity for additional overtime. Based on this updated data, weekly earnings are approximately $1,592.80 per week, based on a 72-hour work week. Top wages for those with over 20 years of service with the company earned $20.60 per hour. Based upon this data, weekly earnings would be approximately $1,812.80 per week, based on a 72-hour work week. This is the basis for Mr. Macy's pre-injury earning capacity as a *boat operator.*

Additional research or information may be gathered to further support the earning potential for boat operators.

Should you require any additional information or assistance, please do not hesitate to contact me.

Sincerely,

Todd S. Capielano M.Ed., LRC, CRC, LPC, CLCP, CCM
Licensed Rehabilitation Counselor & Certified Life Care Planner

EXHIBIT

D

# AsherMeyers,LLC

## DISPUTE ADVISORY & FORENSIC SERVICES

February 22, 2019

Mr. J. Geoffrey Ormsby
Smith & Fawer, LLC
201 St. Charles Avenue
Suite 3702
New Orleans, Louisiana 70170

Re:     Shane Macy

Dear Mr. Ormsby:

This report supplements our report dated January 23, 2019.

You have asked us to calculate the after-tax loss of economic capacity utilizing real (net of inflation) growth and discount rates, in compliance with the methodology specified in Culver II in the above referenced matter.

Shane Macy is a Caucasian male born on September 10, 1983. He was injured as a result of the alleged actions of the defendants on December 16, 2015.

Materials Reviewed

1. 2013 through 2015 U.S. Individual Income Tax Returns ("Tax Returns")

2. Reports dated January 23, 2019 and February 21, 2019 by Todd Capielano of Stokes & Associates ("Capielano Reports")

3. U.S. Department of Labor Report of Earnings dated August 3, 2018

4. Payroll Report for 2018 Employment with Unglesby & Williams

5. 2018 Form 1099-MISC from Lewis O. Unglesby Attorney, LLC

6. 2018 Form W-2 and Earnings Summary from Sintes Boat Works, Inc.

7. Correspondence dated December 28, 2018 from Geoffrey Ormsby



EXHIBIT
tabbies
E

Mr. J. Geoffrey Ormsby
February 22, 2019
Page 2


Earnings Base

*Pre-Accident Earning Capacity*

We have calculated Mr. Macy's pre-accident annual earning capacity under the below alternative scenarios:

*Scenario 1* – Based on the average 2013 through 2015 normalized net earnings as reflected on his Tax Returns, Mr. Macy's pre-accident annual earning capacity totals $56,404 as of the date of the accident.

*Scenario 2* – Based on the Capielano Reports, beginning January 1, 2017, Mr. Macy's pre-accident annual earning capacity totals $74,826 (gross annual wages $82,826 using weekly wage rate of $1,593 based on an hourly rate of $18.10 and average work week of 72 hours less $8,000 of estimated annual work expenses) as of the date of this report.

*Post-Accident Earning Capacity*

Based on the Capielano Reports, Mr. Macy's post-accident annual earning capacity as of this report date totals $40,144 (based on the median wages for a legal secretary outlined in the Capielano Report).

Mr. Macy had no earnings from the date of the accident through February 20, 2018. Based on the U.S. Department of Labor Report of Earnings, the 2018 Payroll Report, 2018 Form 1099-MISC and 2018 Form W-2, referenced above, Mr. Macy earned $25,325 in 2018.

Change in Future Income

We have used real growth factors of 0.0% (2.23% nominal growth rate) in calculating Mr. Macy's annual gross earnings growth beginning in 2019.

Discount Rate

This factor is based upon the rate of return available in risk-free investments (primarily short term and intermediate term U.S. Treasury Securities). The purpose of using this mechanism is to insure that there is a sufficient total amount of cash today to replace future losses incurred. For purposes of this report, we have utilized a real after-tax discount rate ranging from totaling -0.24% to -0.29%.

Mr. J. Geoffrey Ormsby
February 22, 2019
Page 3

<u>Worklife</u>

We have calculated Mr. Macy's loss of future earnings based on a worklife expectancy of 25.7 years as of the reference date of this report (May 20, 2019), or until attaining age 61.4. For this assumption, we have relied upon <u>Life and Worklife Expectancies, Second Edition</u> authored by Hugh Richard, M.S. and Michael Donaldson, Ph.D., Table 4.

<u>Future Medical Costs</u>

Based on the Capielano Reports, Mr. Macy will incur various annual expenses totaling $4,348 and one-time expenses totaling $106,184. There may be additional costs which are properly considered but have not been included in our calculations.

We have assumed that the annual growth rate of Mr. Macy's future medical expenses relating to these costs to be 3.23% (1% real growth, net of inflation).

<u>Life Expectancy</u>

We have calculated Mr. Macy's life expectancy to be 42.8 years as of the reference date of this report, or until attaining age 78.5. For this assumption, we have relied upon <u>Life and Worklife Expectancies, Second Edition</u> authored by Hugh Richard, M.S. and Michael Donaldson, Ph.D., Table 1.

<u>Summary</u>

Based on the above and as summarized on Exhibit 1, we have calculated Mr. Macy's after-tax loss of economic capacity and the present value of his future medical costs to range from $793,690 to $1,157,699.

This report has been authored by Harold A. Asher and Jeffrey E. Meyers.

We reserve the right to amend this report should additional relevant information come to our attention.

Mr. J. Geoffrey Ormsby
February 22, 2019
Page 4

Harold A. Asher does hereby state the following:

In accordance with Rule 26 of the Federal Rules of Civil Procedure, I do hereby state the following:

I have not authored any publications within the preceding 10 years.

I expect to be compensated for my work according to my standard fee schedule, which is $465 per hour, with the exception of court time and depositions, for which my standard rate is $930 for the first hour and $465 for each additional hour.

I have testified as an expert at trial and/or been deposed within the preceding four years in the following matters:

Board of Supervisors of Louisiana State University and Agricultural and Mechanical College v Marshall G. Gerson, Ellvog, Inc. and City of New Orleans
*Civil District for the Parish of Orleans* (trial testimony January 2015)

Michelle D. Allen-Hart, et al v Abbott Simses, PLC, et al
*Civil District for the Parish of Orleans* (deposition January 2015)

MAPP Construction, LLC v Chenevert Architects, et al
*19th Judicial District Court for the Parish of East Baton Rouge* (deposition February 2015)

Lillie Rea and Hilda Wiratunga v Wisconsin Coach Lines, Inc. et al
*United States District Court for the Middle District of Louisiana* (trial testimony March 2015)

Julie Patino v Dillard University
*Civil District Court for the Parish of Orleans* (trial testimony April 2015)

Richard L. Rubin and Mary Rubin v The American Insurance Company, Paramount Remodeling & Roofing Corp., First Financial Insurance Company and C&G Construction of Louisiana, Inc.
*24th Judicial District Court for the Parish of Jefferson* (trial testimony May 2015)

In the Matter of the Complaint of Crosby Marine Transportation, LLC and Crosby Tugs, L.L.C. as Owners and Owners Pro Hac Vice of the M/V Crosby Mariner Petitioning for Exoneration from or Limitation of Liability
*United States District Court for the Western District of Louisiana, Lafayette/Opelousas Division* (trial testimony June 2015)

Mr. J. Geoffrey Ormsby
February 22, 2019
Page 5

Choice Professional Overnight Copy Service, Inc. v Galeas, c/w Broussard v Choice Professional Overnight Copy Service, Inc.
*Civil District for the Parish of Orleans* (deposition May 2015 and trial testimony June 2015)

Lorenzo O. McElroy and Donna S. McElroy, et al v Emergency Room Group, Ltd, et al
*In the Circuit Court of Jackson County, Mississippi* (trial testimony September 2015)

Michael Sartisky v Louisiana Endowment for the Humanities
*United States District Court for the Eastern District of Louisiana* (deposition October 2015)

Timothy L. Chandler v United States of America and Nathaniel B. Greene, Sr.
*United States District Court for the Western District of Louisiana* (deposition November 2015)

Larry Warner and Ava Warner v USAA General Indemnity Insurance Company, Canal Insurance Company and Patrick Alexis
*24ᵗʰ Judicial District Court for the Parish of Jefferson* (trial testimony January 2016)

Stryker Corporation, et al v Christopher Ridgeway, at al
*United States District Court for the Western District of Michigan, Southern Division* (trial testimony February 2016)

FIE, LLC v New Jax Condominium Association, Inc. and Earl Weber, Jr.
*Civil District Court for the Parish of Orleans, State of Louisiana* (trial testimony March 2016)

Jacobee Lee v Louisiana Board of Trustees for State Colleges, et al
*19ᵗʰ Judicial District Court for the Parish of East Baton Rouge, State of Louisiana* (deposition September 2015 and trial testimony March 2016)

Julie Unangst Quinn v Bobby Sperandeo, CPA and Malcolm M. Dienes, LLC
*24ᵗʰ Judicial District Court for the Parish of Jefferson* (deposition March 2016)

Michael Cheese v GIS Marine, LLC et al
*United States District Court for the Eastern District of Louisiana* (deposition April 2016)

Mr. J. Geoffrey Ormsby
February 22, 2019
Page 6

Lagniappe Logistics, Inc. of Mississippi v Scott Buras, Barrett McCreary, Todd Nienaber, Citation Logistics, LLC, Citation Investments, Inc.
*22nd Judicial District Court for the Parish of St. Tammany* (deposition August 2016 and trial testimony October 2016)

Paul Thompson and David Simmons v Williams Companies, Inc., et al
*18th Judicial District Court for the Parish of Iberville* (trial testimony September 2016)

Phylway Construction, LLC v Terrebonne Parish Consolidated Government
*32nd Judicial District Court for the Parish of Terrebonne, State of Louisiana* (deposition October 2016)

Paul Thompson and David Simmons v Williams Companies, Inc., et al
*18th Judicial District Court for the Parish of Iberville* (trial testimony November 2016)

Timothy L. Chandler v United States of America and Nathaniel B. Greene, Sr.
*United States District Court for the Western District of Louisiana* (deposition February 2017)

Cody B. Teague, et al v. Baker Hughes Oilfield Operations, Inc., et al
*In the Circuit Court of Bibb County, AL – CV 2012-900011* (deposition March 2017)

Janet Krug and Michael Krug v Celebrity Cruises, Inc.
*United States District Court for the Southern District of Florida, Miami Division* (deposition May 2017)

Shawn L. Saunders v Canal Insurance Company, et al
*19th Judicial District Court for the Parish of East Baton Rouge* (deposition October 2017)

First American Bankcard, Inc. v Smart Business Technology, Inc., et al
*United States District Court for the Eastern District of Louisiana* (deposition October 2017)

In the Matter of the Arbitration Between:  Sammye M. Brock and Estate of Dr. Don J. Brock, Claimants, v Raymond James & Associates, Inc., Raymond James Financial Inc., Frank Gibson, and Elizabeth Gibson, Respondents
*Finra Case No.:  16-02930* (testimony November 2017)

Mr. J. Geoffrey Ormsby
February 22, 2019
Page 7

Leslie Bateman Brennan v Richard Joseph Brennan, Jr.
*Civil District Court for the Parish of Orleans* (deposition and trial testimony February 2018)

Rebecca H. Holloway, et al v Dr. Glenn E. Hummel, et al
*4ᵗʰ Judicial District Court for the Parish of Ouachita, State of Louisiana* (deposition April 2018)

Leigh Ann Schell and McGready L. Richeson v Kuchler, Polk, Schell, Weiner & Richeson, LLC
*Civil District Court for the Parish of Orleans* (deposition May 2018)

The Finish Line, Inc. v Jayesh Patel; Pumilia & Adamec LLP f/k/a Pumilia Patel & Adamec LLP, and Does 1 through 100, Inclusive
*Superior Court of the State of California for the County of Los Angeles* (deposition May 2018)

Mathes Brierre Architects, APC v Karlton/ISG Enterprises, LLC, International Sales Group, LLC and J.S. Karlton Company, Inc.
*Civil District Court for the Parish of Orleans, State of Louisiana* (trial testimony May 2018)

Angela Morris, as Conservator for Kentheral Chambers, Jr, as incapacitated adult v The Emory Clinic, Inc., Emory University, Jonathan Grossberg, M.D., Joshua Osbun, M.D., Brandon Miller, M.D., John Doe M.D.'s 1-2 and XYZ Corporations
*In the State Court of DeKalb County, State of Georgia* (deposition June 2018)

JAI, LLC and Ashok D. Patel v Jaydel Sachania and Sonia Sachania
*9ᵗʰ Judicial District Court for the Parish of Rapides* (deposition June 2018)

Andre White, Claimant v Flowers Baking Co. of Houston, LLC, Respondent
*The Arbitration Tribunals of the American Arbitration Association* (deposition September 2018)

Hunters Run Gun Club, LLC and The Great International Land Company, LLC v Eddie D. Baker
*United States District Court for the Middle District of Louisiana* (deposition September 2018)

Coastal Industries, LLC v Arkel Constructors, LLC
*American Arbitration Association* (arbitration testimony September 2018)

Mr. J. Geoffrey Ormsby
February 22, 2019
Page 8

J Ellsworth Corporation v American Casualty Company of Reading, PA
*United States District Court for the Eastern District of Louisiana* (deposition October 2018)

Justin P. Hughes v Skanska USA Building, Inc., et al
*Civil District Court for the Parish of Orleans, State of Louisiana* (deposition October 2018)

Jessie Lara-Brown, Claimant v Flowers Baking Co. of Houston, LLC, Respondent
*The Arbitration Tribunals of the American Arbitration Association* (arbitration testimony November 2018)

Mohab Said v Federated Rural Electric Insurance Exchange
*36th Judicial District Court for the Parish of Beauregard*, State of Louisiana (deposition October 2016 and trial testimony February 2019)


Jeffrey E. Meyers does hereby state the following:

In accordance with Rule 26 of the Federal Rules of Civil Procedure, I do hereby state the following:

I have not authored any publications within the preceding 10 years.

I am being compensated for my work according to my standard fee schedule, which is $315 per hour, with the exception of court time and depositions, for which my standard rate is $630 for the first hour and $315 for each additional hour.

I have testified as an expert at trial and/or been deposed within the preceding four years in the following matters:

Heather Roper Kaptein v Jesse Kaptein
*Civil District Court for the Parish of Orleans* (trial testimony March 2015)

Lagniappe Logistics, Inc. of Mississippi v Scott Buras, Barrett McCreary, Todd Nienaber, Citation Logistics, LLC, Citation Investments, Inc.
*22nd Judicial District Court for the Parish of St. Tammany* (deposition August 2016)

Douglas Delaney and Danielle Delaney v Morris Seantry and Ports America Louisiana, LLC
*Civil District Court for the Parish of Orleans* (trial testimony June 2017)

Mr. J. Geoffrey Ormsby
February 22, 2019
Page 9

Philip R. Adams v CoSolutions, Inc.
*United States District Court for the Eastern District of Louisiana* (deposition November 2017)

John Murphy v Cheryl Griffin Murphy
*22nd Judicial District Court for the Parish of St. Tammany* (trial testimony November 2017)

Eliana Amparo Soto v Alireza Sadeghi
*Civil District Court for the Parish of Orleans* (trial testimony December 2017)

Campano, et al v USA
*United States District Court, District of Hawaii* (Report Admitted as Trial Testimony December 2017)

In Re: Lowyless Glasper v Pennymac Holdings, LLC by Pennymac Loan Servicing, LLC Its' Servicing Agent
*United States Bankruptcy Court, Eastern District of Louisiana* (deposition March 2018)

Paradigm Health System, LLC v Barry Faust
*22nd Judicial District Court for the Parish of St. Tammany* (deposition March 2018)

The Finish Line, Inc. v Jayesh Patel; Pumilia & Adamex LLP f/k/a Pumilia Patel & Adamec LLP, and Does 1 through 100, Inclusive
*Superior Court of the State of California for the County of Los Angeles* (deposition April 2018)

Lynda Ronquillo Ton v Hendrikus Ton
*25th Judicial District Court for the Parish of Plaquemines* (trial testimony May 2018)

Parastoo Rezaeimehr v Nasser Pazooki
*24th Judicial District Court for the Parish of Jefferson* (deposition August 2018)

Michael A. Munnings v Terry Burr, et al
*United States District Court for the Middle District of Louisiana* (deposition August 2018)

Aylin Maklansky v Steven Maklansky
*Civil District Court for the Parish of Orleans* (trial testimony September 2018)

Mr. J. Geoffrey Ormsby
February 22, 2019
Page 10

In the Matter of:  Juli Juneau v Stewart J. Juneau
*Civil District Court for the Parish of Orleans* (depositions December 2017 and
September 2018)

Robert Emery Meachem v Andrea Rhodes Meachem
*24nd Judicial District Court for the Parish of Jefferson* (deposition August 2016
and trial testimony September 2016 and October 2018)

Andrew Knight v Kirby Offshore Marine, LLC, et al
*United States District Court for the Eastern District of Louisiana* (trial testimony
February 2019)

We attach the following:

1.   Exhibit 1 – Shane Macy – *Summary of Loss*

2.   Our Curricula Vitae


Harold A. Asher

Jeffrey E. Meyers

Date   2/22/19

Date   2/22/19

# SHANE MACY
## *SUMMARY OF LOSS*

| | SCENARIO 1<br>*PRE-ACCIDENT*<br>*EARNING CAPACITY*<br>*TOTALING $56,404* | SCENARIO 2<br>*PRE-ACCIDENT*<br>*EARNING CAPACITY*<br>*TOTALING $74,826* |
|---|---|---|
| A  PAST LOSS [1] | $  146,362 | $  171,736 |
| B  FUTURE LOSS | 309,287 | 647,922 |
| C  FUTURE MEDICAL COSTS | 338,041 | 338,041 |
| D   TOTAL LOSS | $  793,690 | $  1,157,699 |

*(1) - FROM THE DATE OF THE ACCIDENT THROUGH MAY 20, 2019 (DATE OF TRIAL)*

**EXHIBIT 1**

# *Harold A. Asher, CPA, ABV, CFF, CVA, CFE, FCPA*

## Professional & Business History

Asher Meyers, L.L.C., Co-Founder July 2016 to present
Harold A. Asher, CPA, L.L.C., January 2002 to present
Katz & Asher, Ltd. A Corporation of Certified Public Accountants and Consultants
    Co-founder and Partner (October 1979 to December 2001)
K & A Capital Management, Owned and managed a Registered Investment Advisory Firm
    (1999 to 2001)
Koltun & Buckman, Ltd. (1978 to1979)
Price Waterhouse & Co. (1975 to1978)
Mr. Asher has provided investment advice to clients since 1979.

## Education

Masters of Business Administration, Tulane University (May 1975) with concentration in
    Accounting and Finance
Bachelor of Science with Major in Biology, Tulane University (May 1973)
Professional Education includes at least 40 annual hours.

## Range of Experience

Mr. Asher has experience in compilations, reviews and audits of financial statements; individual, corporate, fiduciary, partnership and estate tax planning and compliance; financial and pension consulting and planning; forensic accounting, fraud investigation, investment advisory services, litigation support and business valuation services.

His financial consulting experience consists of analysis of proposed investment vehicles (including, but not limited to, marketable and closely-held stocks, tax favored investment strategies, bonds and limited partnerships) and assistance in developing a suitable portfolio, which meets the client's specific objectives for liquidity, diversification, risk and return.  He has designed and reviewed internal accounting control systems.  This work defined weaknesses and implemented recommendations to correct them.

He is experienced in pension consulting and compliance that includes analysis of client retirement objectives, investment criteria and determination of cost of funding the non-owner employee benefit.  He has performed administrative services including preparation of Form 5500C/R (Return/Report of Employee Benefit Plan), participants' statements, summary annual reports, balance sheets and statements of income and expenses.

Mr. Asher's extensive litigation support and business valuation services include examination and analysis of data, calculations and formulation of projections, assistance in discovery process, negotiations, depositions and trial testimony.

## *Harold A. Asher, CPA, ABV, CFF, CVA, CFE, FCPA*

His widespread experience in various areas includes, but is not limited to, valuation of medical and legal entities, valuation of commercial business entities, valuation of ownership interest in real estate limited partnerships, valuation of family limited partnerships, valuation of limited liability companies, valuation of participant interest in pension plans, calculation of income for child support purposes, calculation of damages resulting from securities transactions, asset allocation and suitability determination in securities litigation, accounting malpractice claims, calculation of damages resulting from personal injuries, calculation of lost profits, calculation of present value of projected future medical costs, calculation of damages in commercial matters, calculation of damages in construction related matters, calculation of losses relating to business interruption matters, fraud investigation and forensic accounting.

**Qualifications**

Mr. Asher is qualified as an expert witness in the United States District Court, Eastern and Western Districts of Louisiana, Southern District of Alabama, Western District of Michigan Southern Division and District of New Mexico, the United States Bankruptcy Court, Eastern and Middle Districts of Louisiana, Middle District of Tennessee and Southern District of Texas, Corpus Christi Division, the 1st Judicial District Court for the Parish of Caddo, the 24th Judicial District Court for the Parish of Jefferson, the Civil District Court for the Parish of Orleans, the 22nd Judicial District Court for the Parish of St. Tammany, the 19th Judicial District Court for the Parish of East Baton Rouge, the 29th Judicial District Court for the Parish of St. Charles, the 18th Judicial District Court for the Parish of Iberville, the 34th Judicial District Court for the Parish of St. Bernard, the 23rd Judicial District Court for the Parish of St. James, the 15th Judicial District Court for the Parish of Lafayette, the 4th Judicial District Court for the Parish of Ouachita, the 36th Judicial District Court for the Parish of Beauregard, the 143rd Judicial District Court of Ward County, Texas, Court of Common Pleas Hamilton County, Ohio and Circuit Court of Jackson County, Mississippi. In addition, he is qualified in various National Association of Securities Dealers (NASD) proceedings and various American Arbitration Association (AAA) proceedings.

He has been selected by the United States Department of Justice to calculate damages in civil and criminal Matters.

He served as Financial Advisor for both Louisiana Stadium and Exposition District and New Orleans Convention and Visitors Bureau.

Mr. Asher has also served as financial consultant in connection with the relocation of the Charlotte Hornets of the National Basketball Association to New Orleans.

**Personal**

Mr. Asher received his Certified Public Accountant certification in July 1976. He is a member of the American Institute of Certified Public Accountants, its Business Valuation and Forensic &

2

## *Harold A. Asher, CPA, ABV, CFF, CVA, CFE, FCPA*

Litigation Services Section and the Louisiana Society of Certified Public Accountants.
The American Institute of Certified Public Accountants designated Mr. Asher as Accredited in Business Valuation in February 2007 and as Certified in Financial Forensics in July 2008.

He was designated a Certified Fraud Examiner by the Association of Certified Fraud Examiners in February 1995 and a Certified Valuation Analyst by the National Association of Certified Valuators and Analysts in December 1995.

Mr. Asher is a member of the Securities Experts Roundtable.  He received his Series 65 License from the Securities and Exchange Commission in December 1999 and served as a registered investment adviser from 1999 through 2004.

He was designated as a Forensic Certified Public Accountant in March 2006.

Mr. Asher is a member of the National Association of Forensic Economists, American Academy of Economic and Financial Experts and Institute of Business Appraisers.

He served on the Board of Tour de Lis, a cancer support organization.

Mr. Asher was President of the Jewish Federation of Greater New Orleans (1999 through September 2001) and President of the Louisiana Council of American Israeli Public Affairs Committee (AIPAC) from June 2003 to June 2005.

**Contact Information**

Harold A. Asher                                    Office:  504.566.7577
433 Metairie Road, Suite 215              Direct Dial:  504.308.3515
Metairie, Louisiana 70005                   Fax:  504.566.9003
E-Mail:  hasher@asher-meyers.com

## *Jeffrey E. Meyers, CVA, MAFF, CFE*

**Professional & Business History**

Asher Meyers, L.L.C., Co-Founder July 1, 2016 to present
Harold A. Asher, CPA, L.L.C., January 2005 through June 30, 2016
Loyola University of New Orleans, August 2004 to present
University of New Orleans, August 2003 through December 2004
Louisiana Department of Insurance, September 2001 through July 2003

**Education**

Masters of Science in Mathematics, University of New Orleans, December 2004
Concentration in Statistics

Bachelor of Science with major in Mathematics, Louisiana State University, July 2003
Magna Cum Laude, LSU Honors College, Sophomore Honors Distinction

**Range of Experience**

Mr. Meyers' litigation support and business valuation services include examination and analysis of data, calculations and formulation of projections, and assistance in the discovery, negotiation, deposition and trial processes.

Mr. Meyers' has extensive consulting and business valuation experience in various areas, including but not limited to, valuation of commercial business entities, valuation of ownership interest in real estate limited partnerships, valuation of limited liability companies, calculation of income for child support purposes, calculation of damages resulting from securities transactions, asset allocation and suitability determination in securities litigation, calculation of damages resulting from personal injuries, calculation of lost profits, calculation of present value of projected future medical costs, calculation of damages in commercial matters, calculation of damages in construction related matters, calculation of losses relating to business interruption matters, fraud investigation and forensic accounting.

Mr. Meyers' experience includes the application of various statistical concepts including, but not limited to, data analysis, statistical graphs, sampling, regression analysis, data production, probability theory and statistical testing and inference.

**Qualifications**

Mr. Meyers is qualified as an expert witness in the 24th Judicial District Court for the Parish of Jefferson, Civil District Court for the Parish of Orleans, 22nd Judicial District Court for the Parish of St. Tammany, 25th Judicial District Court for the Parish of Plaquemines, United States District Court for the Eastern District of Louisiana, United States District Court for the District of Hawaii and in FINRA Arbitration proceedings.

## *Jeffrey E. Meyers, CVA, MAFF, CFE*

**Personal**

Mr. Meyers was designated a Certified Valuation Analyst by the National Association of Certified Valuators and Analysts in May 2009 and a Master Analyst in Financial Forensics co-sponsored by the National Association of Certified Valuators and Analysts as of July 2010.

The Association of Certified Fraud Examiners designated Mr. Meyers a Certified Fraud Examiner in February 2011.

Mr. Meyers is a member of the National Association of Certified Valuators and Analysts, Association of Certified Fraud Examiners and the American Statistical Association.

Mr. Meyers has been an adjunct professor of mathematics (algebra, finite mathematics and statistics) at Loyola University since 2006.

He was previously elected and served on the Litigation Forensics Board for the National Association of Certified Valuators and Analysts.

He also served on the Editorial Board of the National Litigation Consultants' Review and the Board of Tour de Lis, Inc., a cancer support organization.

**Contact Information**

Jeffrey E. Meyers
433 Metairie Road, Suite 215
Metairie, Louisiana  70005

Phone:  (504) 566-7577
Fax:  (504) 566-9003
E-mail:  jmeyers@asher-meyers.com

### Joseph R. Bridges
### *Maritime Solutions and Consulting*
1210 Baronne St New Orleans, LA
504 579-9418     jrbridges21@gmail.com

**Responses to Wayne E. Wilson Report**
4 March 2019
**Shane Macy versus HINODE KAIUN CO., LTD,
in personam, M/V NICHIRIN, in rem
Civil Action NO. 18-04415
JUDGE Lance M. AFRICK**

Attention:             J. Geoffrey Ormsby and Dylan Leach of Smith & Fawer, L.L.C

**The following documents were reviewed to form an opinion regarding Shane Macy versus HINODE KAIUN Co., Ltd, in personam, M/V Nichirin, in rem.**

1. Cooper T Smith, Supervisor's Investigation Report of Employee Accident/Illness, Shane Macy, dated the 21st of December 2015.
2. Complaint, Shane Macy versus HINODE KAIUN Co., Ltd, in personam, M/V Nichirin, in rem, dated the 30th of April 2018.
3. Answer of Hinode Kaiun Co., Ltd, Shane Macy versus HINODE KAIUN Co., Ltd, in personam, M/V Nichirin, in rem, dated the 19th of October 2018.
4. Defendant's Status Report dated the 21st of December 2018.
5. Plaintiff's Status Report dated the 21st of December 2018.
6. Disclosures of Hinode Kaiun Co., Ltd, dated the 28th of November 2018.
7. Shane Macy deposition transcript and exhibits dated the 8th of January 2019.
8. M/V Nichirin deck log for the 16th of December 2015.
9. Agri Port Services (APS), Port Log & Statement of Facts, M/V Nichirin, 10th of December thru the 19th of December 2015.
10. M/V Nichirin Ship's Particulars.
11. M/V Nichirin Crew Onboard Report dated the 14th of December 2015.
12. Shane Macy, Cooper/T. Smith Employment File Parts 1 & 2
13. Wayne E.Wilson Disclosures
14. Wayne E. Wilson Report
15. Robert Helmstetter transcribed statement dated the 4th of January 2016
16. June M Gill deposition transcript dated the 11th day of February 2019
17. Robert Helmstetter deposition transcript dated the 22nd of January 2019
18. Shane Macy transcribed statement dated the 16th of December 2016
19. M/V Nichirin General Arrangement Plan
20. M/V Nichirin Mooring Rope Equipment Report dated December 2014

*Responses to Wayne E. Wilson Report*

*The Wayne Wilson Report states "1- There were 5 crew members on the bow of the M/V Nichirin including the Chief Mate and Bosun, two of the most experienced people on the ship. This would be more than adequate to safely tie up a ship of this size and type."* It would appear that Wayne Wilson is basing his response solely on the deposition transcript of Chief Mate June M. Gill.[1]

---

[1] June M.Gill deposition transcript, page 22



According to the M/V Nichirin Crew Onboard Report (Crew List), the unlicensed deck department consisted of 1 Bosun, 3 Able Seaman (AB), 2 Ordinary Seaman (OS) and 1 Deck Cadet.  The Disclosures of Hinode Kaiun, Co, Ltd indicates that the following crew members from the deck department might have discoverable information and neither the Bosun or Deck Cadet are listed as having discoverable information.

Chief Officer          June M. Gill
OS                          Erickson Y. Amolo
OS                          Rene F. Beciete

While the M/V Nichirin was berthing one AB would be required to be at the wheel as part of the Bridge Navigation Team further reducing the number of available unlicensed deck personnel for mooring operations forward and aft.  It would not be possible for 5 members of the M/V Nichirin to be forward during mooring operations as described by Wayne Wilson in his report and the deposition testimony of the Chief Officer June M. Gill because both ends of the vessel would require crew members to handle the lines and mooring machinery.  Additionally, if the Bosun and Cadet were forward as stated in the Wayne Wilson report and deposition testimony of June M. Gill, that would only leave 2 AB and 1 Deck Officer aft to tie up the stern, which is not practicable or consistent with the practice of good seamanship.  Furthermore, the deposition testimony of June M. Gill states that 1 member of the forward deck gang was responsible for holding the bitter end of the heaving line which is not required or necessary and would further increase the demands of the other deck gang members to safely pass and secure lines forward.  It is not uncommon to begin preparing the accommodation ladder as the vessel is berthing and this might explain why the Bosun and Deck Cadet were not listed as having discoverable information in the discovery documents as provided.  Based on discovery documents and dubious testimony from June M. Gill the M/V Nichirin was not adequately trained or staffed while berthing at ADM Destrehan on the 16th of December 2015.

*The Wayne Wilson report states "2- I have seen nothing in the documents and other information I have received that would leave me to believe that the deck crew onboard the M/V Nichirin was not well trained. In fact at this point the crew on the bow of the ship had been working together as team for over four months. Their handling of mooring operations as described by the Chief Mate indicates they were properly trained and handled the operation properly."*  The deposition testimony of June M. Gill stated that the 2 spring lines forward, 1 was on a mooring drum and the other was a loose line.[2]  The 2 lines would not pay out at the same rate because the line on the mooring drum would pay out relative to the speed of the mooring drum controls and the loose line would pay out rapidly due to the weight of the line, unless properly attended by the forward deck gang. Someone would be responsible for operating the controls to the mooring drum and it would take 2 deck gang members to control the loose mooring line while paying out. The deposition testimony of both Robert Helmstetter and Shane Macy indicate that the forward deck gang on M/V Nichirin were not providing enough slack on the spring lines they were handling.[3]  This created a dangerous situation for the line handlers and resulted in an injury to Shane Macy and Shane Macy having to cut the whips attached to the forward spring lines.  Shane Macy testified that he looked up and saw the heaving line tied off to the rail as Robert Helmstetter was being dragged down the dock by the spring line he was handling that did not have enough slack.[4]  If in fact, there were 4 deck gang members forward (Bosun, 2 OS and Deck Cadet) as stated by Wayne Wilson and Chief Officer June M. Gill, that would leave only 2 deck gang members aft to handle the same responsibilities as the 4 deck gang members forward.  This would not be consistent with the practice of good seamanship and industry best practices.  There is no evidence to support that the deck crew onboard the M/V Nichirin were properly trained or staffed on the 16th of December 2015.

---

[2] Deposition transcript, June M. Gill, page 42
[3] Deposition transcripts, Robert Helmstetter, page 40 & Shane Macy, pages 75, 79.
[4] Deposition transcript, Shane Macy, pages 75-79

**The Wayne Wilson report states "Mr. Macy states in his statement taken December 28, 2015 and in his deposition taken on January 8, 2019 the messenger line was tied to the rail of the ship and had a strain which made it difficult for him to put the eye of the spring line he was handling on the dock bollard. When Mr. Helmstetter made his statement just two weeks or so after the M/V Nichirin tied up at ADM Destrehan he mentions nothing about the messenger line being tied to the railing of the ship."** Mr. Randles never asked the question regarding the heaving line being tied to the ship's rail in Robert Helmstetter's transcribed statement and therefore it was not addressed. The deposition transcripts of both Robert Helmstetter and Shane Macy are consistent regarding insufficient slack in the spring lines. Robert Helmstetter's transcribed statement regarding where he was standing in relation to Shane Macy while handling the forward spring lines is consistent with Shane Macy's deposition transcript.[5] Robert Helmstetter also testified that the heaving line was bound on something and was under tension and there should not have been tension on the heaving line.[6] Robert Helmstetter stated in his deposition testimony that Shane Macy was a standup guy and would never lie.[7]

**The Wayne Wilson report states "He (Robert Helmstetter) did say the ship didn't give enough slack on the two spring lines and after hollering at them they gave them too much which made it difficult to get the spring lines to the bollards on the dock. This is a fairly common occurrence and I am sure Mr. Macy and Mr. Helmstetter have dealt with this on many occasions."** Handling lines on the dock is a dynamic and not static process and there is an element of routine as well as unpredictability. Robert Helmstetter testified that he did not look up to see if the heaving line was made fast to the rail and that it was not uncommon for there to be tension on the heaving line, but it is not something that is foreseeable and can be anticipated. Robert Helmstetter also testified that the line handlers are watching where they are standing and what they are doing and not paying attention to the heaving line, which is consistent with Shane Macy's comments.[8] Safety is paramount when handling heavy lines on the edge of a dock with slippery surfaces such as ADM Destrehan.

**The Wayne Wilson report states "Chief Mate Gil made it very clear in his deposition that during his 10 months on the ship and during numerous docking maneuvers the messenger line was never tied to the ship's rail while the mooring lines were being payed out. In fact he had one of his five crew members on the bow of the ship dedicated to handling the messenger line."** The testimony of June M. Gill is dubious at best and by his own testimony, he was not aware of an incident that resulted in the injury to Shane Macy until 2018.[9] June M. Gill testified that there was 5 crew members forward while the M/V Nichirin was docking at ADM Destrehan on the 16th of December 2015 and that there was normally 3 AB's and a Second Officer on the stern.[10] It would be impossible to have 3 AB's on the stern while docking because there are only 3 AB's onboard as per the M/V Nichirin crew list and 1 of them would be at the wheel in the Wheelhouse. Additionally, it would be impossible to have 1 AB on the Bridge, 4 unlicensed deck gang members forward and 3 AB's aft during mooring operations when there is only 7 (including the Deck Cadet) unlicensed deck gang members aboard, according to the crew list. The bitter end of the heaving line can be made fast directly to the eye of the mooring line or to the messenger line made up to the eye of the mooring line. It is not necessary to retain the bitter end of the heaving line onboard during berthing operations unless there are not enough heaving lines onboard to accomplish the berthing operation efficiently and safely.

---

[5] Transcribed statement, Robert Helmstetter, page 6 and deposition transcript, Shane Macy, page 64
[6] Deposition transcript, Robert Helmstetter, pages 61-63
[7] Deposition transcript, Robert Helmstetter, pages 59-60
[8] Deposition transcripts, Robert Helmstetter, pages 71-73 and deposition transcript, Shane Macy, pages 71, 72
[9] Deposition transcript, June M. Gill, page 11
[10] Deposition transcript, June M. Gill, page 12

It would be irresponsible to have 1 unlicensed crew member dedicated to holding the bitter end of the heaving line because the M/V Nichirin was operating with limited unlicensed deck personnel during berthing operations at ADM Destrehan on the 16th of December 2015. The testimony of June M. Gill is dubious at best, stating that there are always 5 deck personnel forward during mooring operations. June M. Gill further testified that "Normally we don't tie the heaving line while on the process of paying out the heaving line", and later testified that they have never tied off the heaving line while paying out the spring lines.[11] Additionally, June M. Gill testified that there is always someone holding the bitter end of the heaving line to prevent the bitter end of the heaving line from falling into the water.[12] Additionally, June M. Gill testified that the forward deck gang had tied a bight of the heaving lines to the whips attached to the eyes of the spring lines. If you are concerned about the bitter end of the heaving line falling into the water, it would be logical to tie the bitter end to the eye of the spring line or to the whips attached to the eyes of the spring lines. This testimony is not consistent with the practice of good seamanship and industry best practices. June M. Gill further testified, that he would be watching what was happening on the dock as well as onboard the foredeck when lines were being passed ashore and if there was a problem ashore his attention would be diverted ashore.[13] June M. Gill would not be aware that the heaving line had been made fast to the ship's rail if his attention was diverted ashore. In my opinion it is not a realistic or accurate statement that the deck gang forward has never tied off the heaving line to the ship's rail in the time June M. Gill was Chief Officer onboard the M/V Nichirin.

***In response to Wayne Wilson's opinions regarding if the heaving line was made fast to the ship's rail.***
1. It is the responsibility of all concerned, including the deck gang forward and aft onboard the M/V Nichirin to ensure a safe and accident free operation. Shane Macy and Robert Helmstetter had to react to the lack of slack provided on the heaving line and spring lines by the M/V Nichirin deck gang forward. Furthermore, the actions of the M/V Nichirin created a dangerous situation for the line handlers resulting in an injury to Shane Macy.
2. Both Shane Macy and Robert Helmstetter stated that while handling lines at ADM Destrehan their paramount concern was for their footing and safety while walking the mooring lines down the edge of the dock. Robert Helmstetter testified that he did not look up to see if the heaving line was made fast to the rail and that it was not uncommon for there to be tension on the heaving line, but it is not something that is foreseeable and can be anticipated.[14]
3. Robert Helmstetter testified that he did not look up to see if the heaving line was made fast to the rail and that it was not uncommon for there to be tension on the heaving line, but it is not something that is foreseeable and can be anticipated.
6. Wayne Wilson's comment is self-serving and not consistent with the facts, "Based on these safety meeting reports, Mr, Macy knew or should have known he needed to be aware of what was happening on the ship, including that the messenger line could be tied to the ship's rail". Shane Macy testified when questioned why he was not looking up at the ship, "It's not common that I would have needed to do that, but, yes, I could have -- actually, because I have to be watching in front of me -- I am standing right at the edge of a dock where the ship is closing in, and sometimes there's debris on the dock, so I have to be watching where I am walking. I am also wearing personal protective equipment, so I have to be looking in the direction that I am going so I don't trip and fall off.

---

[11] Deposition transcript, June M. Gill, pages 23-25
[12] Deposition transcript, June M. Gill, pages 33-34
[13] Deposition transcript, June M. Gill, pages 35-36
[14] Deposition transcript, Robert Helmstetter, pages 72-73

If I am trying to drag a line while looking up, the likeliness that I will fall over the edge into the water in between the dock and the ship is very high. For safety, we are always watching where we are going, so I wouldn't have looked."[15]  Robert Helmstetter testified that he did not look up to see if the heaving line was made fast to the rail and that it was not uncommon for there to be tension on the heaving line, but it is not something that is foreseeable and can be anticipated.

**_In response to Wayne Wilson's closing conclusion._**
As previously stated, there is an element of routine and unpredictability working as a line handler.  In every marine job there is also an element of danger.  It is my opinion that safety is always paramount, as Shane Macy articulated very well, "If I am trying to drag a line while looking up, the likeliness that I will fall over the edge into the water in between the dock and the ship is very high. For safety, we are always watching where we are going." It is also my opinion that when you are in the act of placing the eye of a heavy mooring line onto a bollard it would not be practical or recommended practice to look up over your shoulder to the forecastle of a ship that is significantly higher than you and behind your line of sight to the bollard.  The lack of slack on the heaving line provided by the forward deck gang of the M/V Nichirin as Shane Macy was attempting to place the eye of the spring line onto the bollard is the cause of his injuries.

**_In response to June M. Gill's deposition testimony._**
June M. Gill learned of the injury to Shane Macy in 2018 when his Marine Superintendent asked him to make a statement. The 3 below individuals were present and in the room during June M. Gill's telephonic deposition on the 11th of February 2019.
- Captain Andrew Malpass, President/General Manager and Co-Owner of Pandiman, local correspondent for Kaiun Steamship
- Jennifer Magsino, Manager of the People Claims Division of Pandiman
- Captain Marcillus Estella, Marine Superintendent, Company Manager for the Fleet of Vessels

In my 40 plus years of experience handling claims and working with P&I Clubs etc., the 3 above individuals would be tasked with finding the best possible results for the Owners of the M/V Nichirin.  June M. Gill's testimony was dubious at best and he made numerous statements that are not supported by the facts. June M. Gill would be under pressure to provide answers that he felt the above individuals wanted to hear.

**_Mr. Gill made the following statements in his deposition testimony that were not consistent with testimony and the facts._**
- _There were 5 crew members (Chief Officer, Bosun, 2 OS and Deck Cadet) forward and 4 crew members aft (Second Officer and 3 AB) when the M/V Nichirin is berthing._
  There is always an AB on the wheel on the Bridge when the vessel is maneuvering to/from and berthing/unberthing and that would require the M/V Nichirin to have 4 AB's onboard.  The disclosures of Hinode Kaiun state that only June M. Gill and the 2 OS had discoverable information forward and the crew list for the M/V Nichirin has 1 Bosun, 3 AB's, 2 OS and 1 Deck Cadet.
- _There is always someone forward holding the bitter end of the heaving line._
  Who holds the bitter end of the heaving line aft when the vessel is berthing, there are fewer people aft during mooring operations?  There is no requirement to retain the bitter end of the heaving line onboard unless there are not enough heaving lines to secure the vessel safely.

---

[15] Deposition transcript, Shane Macy, pages 71-72

Additionally, if the concern is retrieving the heaving lines, as the vessel's mooring lines are placed on the bollards ashore the vessel is close enough to the berth to make it easy for the line handlers to throw the heaving lines back to the ship which is customary and routine.

- *June M. Gill further testified, that he would be watching what was happening on the dock as well as onboard the foredeck when lines were being passed ashore and if there was a problem ashore his attention would be diverted ashore. June M. Gill further stated that the heaving line has never been made fast to the ship's rail.*

If your attention is diverted ashore you cannot see what is happening on the foredeck. Robert Helmstetter was being dragged by the spring line he was handling with insufficient slack and Shane Macy had to cut the whips that were attached to the 2 spring lines and if June M. Gill was observing the 2 line handlers struggling with the spring lines, he would not be aware that the heaving line had been made fast to the ship's rail. Additionally, if there was only 2 OS forward as indicated by the Disclosures of Hinode Kaiun they would not be able to handle the 2 spring lines and the heaving line at the same time. It requires a minimum of 2 deck gang members to pay out the 2 spring lines, heave in the loose spring on the warping head to take in all slack, stop off the loose spring line and secure the loose spring line onto the Bitts.



*June M. Gill testified that the Deck Cadet was responsible for holding the bitter end of the heaving line during the mooring operations.*

Shane Macy testified that he saw the heaving line made fast to the ship's rail and Robert Helmstetter testified that the heaving line was under tension but should not have been. This would indicate that the Deck Cadet was not ensuring that there was enough slack in the heaving line and or the Deck Cadet was not holding the bitter end of the heaving line as June M. Gill testified. If the Deck Cadet was not present on the foredeck as the Disclosures of Hinode Kaiun indicate, the 2 OS would not be able to handle the 2 spring lines and the heaving line at the same time.

This report is based on the documents and information listed herein. I reserve the right to modify and or supplement this report should additional information and or evidence become available.

Respectfully,

Captain Joseph R. Bridges

6